WELCH, Judge.
The State of Alabama appeals the trial court’s order declaring unconstitutional that portion of former § 15-20-22(a)(l), Ala.Code 1975 — a part of the Community Notification Act (“CNA”), § 15-20-20 et seq., Ala.Code 1975 — requiring an adult criminal sex offender to provide the Alabama Department of Corrections (“DOC”), at least 45 days prior to the offender’s release from custody,[1] “the actual address at which he or she will reside or live upon release” and dismissing the indictment charging Thornal Lee Adams with violating that section. We affirm.[2]

Facts

The facts are undisputed. Adams was convicted in 2001 of first-degree rape and first-degree sodomy. Section 15-20-21(1), Ala.Code 1975, defines “adult criminal sex offender” as any “person convicted of a criminal sex offense” and § 15-20-21(4), Ala.Code 1975, lists first-degree rape and first-degree sodomy as criminal sex offenses. Therefore, Adams is an adult criminal sex offender subject to the provisions of the CNA. Adams was incarcerated in Kilby Correctional Facility (“Kilby”) and scheduled for release in 2008, after completing his sentence. He failed to provide the DOC with an actual address where he would live or reside after his release and, on his scheduled release date, he was arrested and transported to the Montgomery County Detention Facility for violating § 15-20-22(a)(l), Ala.Code 1975. Adams was subsequently appointed counsel and was indicted for that offense.
Counsel filed a motion to dismiss the indictment, arguing that the portion of former § 15-20-22(a)(l) that required an adult criminal sex offender to provide the DOC the actual address at which he or she would live or reside upon release at least 45 days before the offender’s release from custody was unconstitutional on various grounds. Specifically, counsel argued that that portion of § 15-20-22(a)(l) was unconstitutional under both the United States Constitution and the Alabama Constitution because: (1) it did not provide any notice as to how a homeless adult *729 criminal sex offender could comply with the statute and, thus, was vague on its face and as applied to Adams; (2) it constituted cruel and unusual punishment as applied to Adams because it punished him for his status as a homeless person; (3) it violated Adams’s right to due process because it required Adams to perform an act that he was incapable of performing; and (4) it violated Adams’s right to equal protection of the law because it incarcerated him for his indigence when other offenders who were not indigent would not be punished under the statute.
The State filed a response to the motion, arguing that the portion of § 15-20-22(a)(1) at issue: (1) was not unconstitutionally vague because, it argued, the term “actual address” simply meant the location where the offender could be found after his or her release; (2) did not constitute cruel and unusual punishment because, it argued, it did not punish Adams for his homelessness but solely for failing to provide the location where he could be found after his release; (3) did not violate Adams’s right to due process because, it said, Adams could have provided a “real location” where he could be found after his release and, thus, could have complied with the statute but refused to do so; and (4) did not violate Adams’s right to equal protection of the law because, it argued, the statute did not punish Adams for his indigence but punished him because he refused to comply with the statute when he could have done so.
Adams’s case was assigned to Montgomery circuit judge Truman Hobbs, who conducted a hearing on the motion to dismiss on July 13, 2009. Judge Hobbs consolidated Adams’s case with Richard Coppage’s case (case no. CC-09-323) for purposes of the hearing; the circumstances surrounding Coppage’s case were similar to Adams’s case in all relevant aspects, and Coppage’s motion to dismiss involved the same legal issue.[3] At the hearing, Judge Hobbs accepted as evidence a transcript of the hearing conducted before Judge Tracy McCooey in a similar case involving Jeffrey Lee Seagle (case no. CC-09-733), in which Judge McCooey dismissed the indictment against Seagle.[4] On August 21, 2009, Judge Hobbs entered a single order dismissing the indictments against Cop-page and Adams on the same four grounds asserted in the motions to dismiss.
The following evidence was presented in the trial court. Adams testified that he was a convicted sex offender and that he had been incarcerated in Kilby for seven months, with a scheduled release date of June 7, 2008.[5] In early 2008, Adams said, his classification officer asked him for an address where he would be living after his release. Adams told the officer that he did not have a place to live, and he asked the officer for advice. The officer told Adams that he had to get an address and that the library would have the information he needed to do so. Adams said that he did not believe that he could list a park bench or other public place as an address, and that he was told that he could not invent an address or list an address that did not comply with the residency restrictions ■ in the CNA because the address *730 would be both verified as a true address and checked to determine whether it complied with the CNA. Adams testified that he went to the Kilby library and obtained a listing of halfway houses. He-wrote to all the halfway houses on the list that indicated they accepted sex offenders, approximately 13 to 15, but he had received no responses within 45 days of his scheduled release. Adams said that Kilby did not have a listing of apartments, rental houses, or motels, but that even if it did, he was indigent and could not have afforded to rent an apartment, house, or even a motel room. He also said that he did not have access to the Internet at Kilby; that he was not permitted to make telephone calls around the state to search for a place to live; that he could not leave the prison to look for a place to live; and that Kilby did not have any listing of schools, housing projects, etc., in the state to enable him to determine where he could live after his release and be in compliance with the residency restrictions in the CNA. Adams further testified that he had no friends or family with whom he could live and be in compliance with the residency restrictions in the CNA.
Adams testified that approximately 45 days before his scheduled release date, he was asked to fill out a form and to provide an address where he would be living when he was released. Adams wrote on the form “I don’t have an address” and signed it. Adams said, however, that he received a response from one halfway house three days before his scheduled release from Kilby informing him that he had been accepted to live there but that when he informed his classification officer, he was told “it was too late for an address” and he was transported to the Montgomery County Detention Facility on the day of his release from Kilby.[6]
Rosie Smith, a paralegal with the Southern Poverty Law Center, testified that in May 2009 she conducted extensive research on available housing for homeless sex offenders. According to Smith, she looked at the list of halfway houses provided by Kilby, contacted eight regional offices of the Alabama Homeless Coalition, and conducted exhaustive Internet searches. Smith ultimately contacted 60 homeless shelters and/or halfway houses in Alabama and found that only 4 of those shelters/halfway houses accepted sex offenders. At the time she conducted her research, Smith said, all four of the places that accepted sex offenders were full. With respect to the list of halfway houses provided by Kilby to its prisoners, Smith testified that “a lot” of the addresses on the list were incorrect; that the list incorrectly stated that certain shelters/halfway houses accepted sex offenders when they did not; and that she was unable to find valid telephone numbers or addresses for many of the shelters/halfway houses listed, suggesting that they were no longer open. Of the places on the Kilby list, Smith found only one that accepted sex offenders, and the director of that shelter informed her that available spots were severely limited because of funding issues. Smith also testified that one of the other three places she had found that accepted sex offenders required a $200 application fee that would rarely be waived, as well as a fee to live there, again because of funding issues, and that acceptance was solely in the director’s discretion; that another place she found that accepted sex offenders accepted only certain sex offenders (those whose offenses were committed *731 against adults) and that acceptance was solely in the director’s discretion; and that the fourth, and final, place that she found that accepted sex offenders was limited solely to those offenders who had HIV or AIDS.
At the hearing, a blank copy of the form Adams said he had been required to fill out before his release from Kilby was introduced into evidence. The form is entitled “Alabama Department of Corrections Sex Offender Notification Worksheet.” It appears from the hearing that the form used by Kilby is a standardized form used by the DOC throughout the State prison system. The form requests the “intended living address” of the offender to be released and provides a space for the offender to supply his or her “street/city/state/ zip,” as well as his or her “county,” “phone number,” “contact (residency),” and “employer’s name and address (if any)” and “phone number.” The form also requires the signature of the offender to be released with the following acknowledgment:
“I hereby acknowledge that upon my release, I must live and abide according to the laws of the State of Alabama governing my conviction as a sex offender and I understand that I must report and register with the Sheriff of the county of residency within 7 days of my release. I understand that failure to do so can result in a conviction of a Class C felony. I also acknowledge that if I reside in a state other than Alabama, I must abide by the laws of that state.”
Also introduced at Adams’s hearing was a copy of DOC Regulation No. 455. That regulation provides generally the procedure to be used by prisons to comply with the CNA, and specifically with § 15-20-22, Ala.Code 1975, before a sex offender’s release from prison. The regulation requires that the classification supervisor at each prison instruct any sex offender scheduled for release to fill out the “Alabama Department of Corrections Sex Offender Notification Worksheet”; that within five days of receiving an offender’s form, the classification supervisor shall provide, “by telephone,” the “proposed living and employment address” provided by the offender “to the local law-enforcement authorities of the declared county of residence and employment, if any” so that the local authorities may verify and approve the addresses; and that, if the living address provided by the offender is not approved, the classification officer shall “[fin-form the inmate that the provided living address was not approved and a new address is required.” The regulation further provides that, if a “living address ... is not provided and approved 45 days prior to release,” the classification supervisor shall notify the warden of the prison, and the warden, or other designated officer in the prison, “shall obtain a warrant for the arrest of the offender, for violation of the Alabama Community Notification Act.”

Standard of Review

“Where, as here, the facts of a case are essentially undisputed, this Court must determine whether the trial court misapplied the law to the undisputed facts, applying a de novo standard of review.” Continental Nat’l Indem. Co. v. Fields, 926 So.2d 1033, 1035 (Ala.2005). ‘Where the appeal concerns only questions of law, ‘there is no presumption of correctness in favor of the trial court’s judgment; this court’s review of legal issues is de novo.’” L.B.S. v. L.M.S., 826 So.2d 178, 185 (Ala.Civ.App.2002) (quoting Morgan Bldg. & Spas, Inc. v. Gillett, 762 So.2d 366, 368 (Ala.Civ.App.2000)). “In addition, ‘[w]hen an appellate court interprets a statute or considers the constitutionality of a statutory provision, no presumption of correctness attaches to the trial court’s interpretation of the stat *732 ute.’ ” Id. (quoting Monroe v. Valhalla Cemetery Co., 749 So.2d 470, 471-72 (Ala. Oiv.App.1999)). An appellate court’s “review of constitutional challenges to legislative enactments is de novo.” Richards v. Izzi, 819 So.2d 25, 29 n. 3 (Ala.2001).
Moreover, statutes are presumed to be constitutional. As the Alabama Supreme Court has explained:
“[I]n passing upon the constitutionality of a legislative act, the courts uniformly approach the question with every presumption and intendment in favor of its validity, and seek to sustain rather than strike down the enactment of a coordinate branch of the government. All these principles are embraced in the simple statement that it is the recognized duty of the court to sustain the act unless it is clear beyond reasonable doubt that it is violative of the fundamental law. State ex rel. Wilkinson v. Murphy, 237 Ala. 332, 186 So. 487, 121 A.L.R. 283 [ (1939) ].
“Another principle which is recognized with practical unanimity, and leading to the same end, is that the courts do not hold statutes invalid because they think there are elements therein which are violative of natural justice or in conflict with the court’s notions of natural, social, or political rights of the citizen, not guaranteed by the constitution itself. Nor even if the courts think the act is harsh or in some degree unfair, and presents chances for abuse, or is of doubtful propriety. All of these questions of propriety, wisdom, necessity, utility, and expediency are held exclusively for the legislative bodies, and are matters with which the courts have no concern. This principle is embraced within the simple statement that the only question for the court to decide is one of power, not of expediency or wisdom. 11 Am.Jur. pp. 799-812; A.F. of L. v. Reilly, District Court of Colorado, 7 Labor Cases No. 61, 761.”
Alabama State Fed’n of Labor v. McAdory, 246 Ala. 1, 9-10, 18 So.2d 810, 815 (1944). Simply put, “[w]e must afford the Legislature the highest degree of deference, and construe its acts as constitutional if their language so permits.” Monroe v. Harco, Inc., 762 So.2d 828, 831 (Ala.2000). “[I]n order to overcome the presumption of constitutionality ... the party asserting the unconstitutionality of the [statute], bears the burden ‘to show that [the statute] is not constitutional.’ ” State ex rel. King v. Morton, 955 So.2d 1012, 1017 (Ala. 2006) (quoting Board of Trs. of Employees’ Retirement Sys. v. Talley, 291 Ala. 307, 310, 280 So.2d 553, 556 (1973)).

Analysis

All 50 states, the District of Columbia, and the federal government have enacted statutes providing for registration of sex offenders and for community notification of some of the personal information — including the whereabouts — of such offenders when they are released from incarceration. Smith v. Doe, 538 U.S. 84, 89-90, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2003).
The CNA, originally enacted in 1996,[7] provides a system for law enforcement to monitor sex offenders who have been released from prison and to notify the public of the presence of a sex offender in a community; it also places residency and other restrictions on sex offenders who have been released from prison and *733 imposes reporting requirements. The CNA coincides with the registration requirements for sex offenders found in § 13A-11-200, Ala.Code 1975. The pri-rnary purpose of the CNA is to protect the public, particularly children, from sex offenders by gathering and disseminating information about sex offenders both to law-enforcement agencies and to the communities in which sex offenders are living and/or working.[8] The CNA has been (te-scribed as “one of the most far-reaching and restrictive sex offender registration laws in the United States.” Larkin v. *734 King, (Ms. No. 2:10-CV-460-MEF, June 8, 2010) (M.D.Ala.2010) (not published in F.Supp.2d) (footnotes and internal citations omitted).
One of the requirements imposed on sex offenders by the CNA — the requirement at issue here — is to provide to the DOC, before being released from prison, an address at which the sex offender will live or reside upon being released. Various versions of this requirement have been included in the CNA since its inception in 1996. See Act No. 96-793, Ala. Acts 1996 (requiring that “[t]hirty days prior to ... release” a sex offender provide “the address at which he or she will reside upon release from incarceration”); Act No. 98-489, Ala. Acts 1998 (requiring that “[t]hirty days prior to ... release” a sex offender provide “the actual living address at which he or she will reside upon release”); Act No. 99-572, Ala. Acts 1999 (requiring that “[t]hirty days prior to ... release” a sex offender provide “the actual living address at which he or she will reside upon release”); and Act No. 2001-1127, Ala. Acts 2001 (requiring that “[tjhirty days prior to ... release” a sex offender provide “the actual living address at which he or she will reside upon release”). At the times of the crime in this case, § 15-20-22(a)(l), as amended effective October 1, 2005, by Act No. 2005-801, Ala. Acts 2005, provided:
“(a) Forty-five days prior to the release of an adult criminal sex offender, the following shall apply:
“(1) The responsible agency[9] shall require the adult criminal sex offender to declare, in writing or by electronic means approved by the Director of the Department of Public Safety, the actual address at which he or she will reside or live upon release and the name and physical address of his or her employer, if any. Any failure to provide timely and accurate declarations shall constitute a Class C felony. Any adult criminal sex offender in violation of this section shall be ineligible for release on probation or parole. Any adult criminal sex offender in violation of this section who is to be released due to the expiration of his or her sentence shall be charged with violating this section and, upon release, shall immediately be remanded to the custody of the sheriff of the county in which the violation occurred. Any adult criminal sex offender charged with violating this section may only be released on bond on the condition that the offender is in compliance with this section before being released.”
The State argues on appeal that the trial court’s finding that the former version of § 15 — 20—22(a)(1) is unconstitutional on four grounds is erroneous because, it says, if § 15-20-22(a)(l) is properly construed, it is not unconstitutional. In this regard, the State appears to agree with the trial court that the phrase “actual address at which he or she will reside” is ambiguous, and it urges this Court to broadly construe the phrase “to mean any physical place where such a person will be making his residence, either temporarily or permanently, whether that be a private dwelling, a shelter, a boat, a park bench, a bridge, or some other geographical space.” Such a construction, the State argues, would be consistent with the legislative intent be *735 hind the CNA and would render the statute constitutional in all respects.
We reject the State’s proposed construction of former § 15 — 20—22(a)(1)—which essentially requests us to substitute the term “location” for the term “address” — because we find it unnecessary to even engage in judicial construction of the statute. The words in the phrase “actual address at which he or she will reside or live” are neither ambiguous nor undefinable, and their plain meaning is easily applied to former § 15 — 20—22(a)(1).
It is well settled that “[wjords used in the statute must be given their natural, plain, ordinary, and commonly understood meaning, and where plain language is used a court is bound to interpret that language to mean exactly what it says.” Tuscaloosa County Comm’n v. Deputy Sheriffs’ Ass’n of Tuscaloosa County, 589 So.2d 687, 689 (Ala.1991). “[T]he first rule of statutory construction [is] that where the meaning of the plain language of the statute is clear, it must be construed according to its plain language.” Ex parte United Serv. Stations, Inc., 628 So.2d 501, 504 (Ala.1993). “Principles of statutory construction instruct this Court to interpret the plain language of a statute to mean exactly what it says and to engage in judicial construction only if the language in the statute is ambiguous.” Ex parte Pratt, 815 So.2d 582, 585 (Ala.2001).
“The cardinal rule of statutory interpretation is to determine and give effect to the intent of the legislature as manifested in the language of the statute.” Ex parte State Dep’t of Revenue, 683 So.2d 980, 983 (Ala.1996) (emphasis added). Although legislative intent “may be gleaned from the language used, the reason and necessity for the act, and the purpose sought to be obtained,” Ex parte Holladay, 466 So.2d 956, 960 (Ala.1985), “[i]n construing [a] statute, this Court should gather the intent of the legislature from the language of the statute itself, if possible.” Pace v. Armstrong World Indus., Inc., 578 So.2d 281, 283 (Ala.1991). “Absent a clearly expressed legislative intent, to the contrary, the language of the statute is conclusive,” id., and “the court must give effect to the clear meaning of that language.” Beavers v. County of Walker, 645 So.2d 1365, 1376-77 (Ala.1994).
This fundamental rule of statutory construction applies to penal statutes. “Absent any indication to the contrary, the words [in a penal statute] must be given their ordinary and normal meaning.” Walker v. State, 428 So.2d 139, 141 (Ala. Crim.App.1982). “‘Penal statutes are to reach no further in meaning than their words,’ ” Ex parte Bertram, 884 So.2d 889, 891 (Ala.2003) (quoting Clements v. State, 370 So.2d 723, 725 (Ala.1979), overruled on other grounds by Beck v. State, 396 So.2d 645 (Ala.1980)), and “it is well established that criminal statutes should not be ‘extended by construction,’ ” Ex parte Evers, 434 So.2d 813, 817 (Ala.1983) (quoting Locklear v. State, 50 Ala.App. 679, 282 So.2d 116 (1973)).
In sum, “[i]f the language of [a] statute is unambiguous, then there is no room for judicial construction and the clearly expressed intent of the legislature [in the plain language of the statute] must be given effect.” Blue Cross & Blue Shield of Alabama, Inc. v. Nielsen, 714 So.2d 293, 296 (Ala.1998) (quoting IMED Corp. v. Systems Eng’g Assocs. Corp., 602 So.2d 344, 346 (Ala.1992)). “[0]nly if there is no rational way to interpret the words stated will we look beyond those words to determine legislative intent.” DeKalb County LP Gas Co. v. Suburban Gas, Inc., 729 So.2d 270, 276 (Ala.1998). “We should turn to extrinsic aids to determine the meaning of a piece of legislation only if we can draw no rational conclusion from a *736 straightforward application, of the terms of the statute.” 729 So.2d at 277.
In determining whether judicial construction is required, “[t]he language of the entire statute under review must be read together and the determination of any ambiguity must be made on the basis of the entire statute.” Sheffield v. State, 708 So.2d 899, 907 (Ala.Crim.App. 1997). “Because the meaning of statutory language depends on context, a statute is to be read as a whole.” Ex parte Jackson, 614 So.2d 405, 406 (Ala.1993). We must also bear in mind that “ ‘[t]here is a presumption that every word, sentence, or provision was intended for some useful purpose, has some force and effect, and that some effect is to be given to each, and also that no superfluous words or provisions were used.’ ” Sheffield v. State, 708 So.2d 899, 909 (Ala.Crim.App.1997) (quoting 82 C.J.S. Statutes § 316 at pp. 551-52 (1953)). Finally, “it is well established ' that in interpreting a statute, a court accepts an administrative interpretation of the statute by the agency charged with its administration, if the interpretation is reasonable.” Ex parte State Dep’t of Revenue, 683 So.2d at 983. “Absent a compelling reason not to do so, a court will give great weight to any agency’s interpretations of a statute and will consider them persuasive.” Id.
In examining the plain language of § 15-20-22(a)(l) in light of the entire CNA as well as the DOC’s administrative regulation for implementing of the CNA, we simply can find no ambiguity in § 15-20-22(a)(1) that would require judicial construction, as urged by the State. The DOC’s administrative regulation implementing the CNA clearly interprets the phrase “actual address at which he or she will reside or live” according to its plain meaning and requires that a sex offender provide a place where mail can be received by the offender, such as a house, apartment, or other fixed place, and not merely a geographical location or other public place. With respect to the CNA as a whole, we note that the legislature used several different terms in the various provisions of the CNA. Not only did the legislature use the term “address,” see §§ 15-20-20.1, 15-20-22(a)(l), 15-20-24(a) and (b), 15-20-25.1(b), 15-20-26(e), 15-20-29(a) and (b), 15-20-30(a), (b), and (c), it also used the term “residence,” see §§ 15-20-20.1, 15-20-22(a)(2) and (3), 15-20-23(a) and (b), 15-20-24(b), 15-20-25, 15-20-25.1(b), 15-20-25.3(e), 15-20-26(a), (b), and (c), § 15-20-28(g)(l) and (2), 15-20-29(b); “place of lodging,” see § 15-20-25.1(a), (b), and (c); and “living accommodation,” see § 15-20-26(a), (b), and (c). “ ‘[W]hen the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended.... The use of different terms within related statutes generally implies that different meanings were intended.’” Trott v. Brinks, Inc., 972 So.2d 81, 85 (Ala.2007) (quoting 2A Norman Singer, Sutherland on Statutes and Statutory Construction § 46:06, at 194 (6th ed.2000) (footnotes omitted)). Thus, we must presume that in using these various terms, the legislature intended for each to have its own meaning.
Applying the plain, ordinary, and commonly understood meaning of the terms “living” and “accommodation,” this Court has held that “living accommodation” simply means “any overnight lodging, either temporary or permanent.” Sellers v. State, 935 So.2d 1207, 1213 (Aa.Crim.App. 2005). In doing so, this Court also recognized that the term “lodging” “is defined in Memam-Webster’s Collegiate Dictionary 731 (11th ed. 2003), as ‘a place to live,’ ‘sleeping accommodations,’ ‘a temporary place to stay,’ and ‘a room in the house of *737 another used as a residence.’ ” Id. The “actual address at which he or she will reside or live” must, therefore, mean something different than a temporary place where one stays or sleeps.
“Address” is defined as “[t]he place where mail or other communication is sent.” Black’s Law Dictionary 42 (8th ed. 2004).[10] See also Merriam-Webster’s Collegiate Dictionary 15 (11th ed. 2003) (defining “address,” in relevant part, as “a place where a person or organization may be communicated with”). Merriamr-Web-ster’s Collegiate Dictionary 728,1060 (11th ed. 2003), defines “live,” in relevant part, as “to occupy a home” or “dwell,” and “reside” as “to dwell permanently or continuously.” Although Black’s Law Dictionary does not specifically define “live” or “reside,” it does define “residence,” in relevant part, as follows:
“The act or fact of living in a given place for some time ... The place where one actually lives, as distinguished from a domicile ... Residence usu[ally] just means bodily presence as an inhabitant in a given place; domicile usu[ally] requires bodily presence plus an intention to make the place one’s home.... A house or other fixed abode; a dwelling.”
Black’s Law Dictionary 1335 (8th ed. 2004).[11]
When these plain, ordinary, and commonly understood meanings of the terms “address,” “reside” and “live” are applied to former § 15-20-22(a)(l), and when that statute is read in context of the entire CNA, including the express legislative intent, it is clear that the phrase “actual address at which he or she will live or reside” means a fixed place where one lives continuously for a period and where mail can be received.[12] Because the plain *738 language of former § 15-20-22(a)(l) is clear and unambiguous, it is unnecessary to judicially construe that statute as requested by the State.[13]
We now turn to the trial court’s determination that former § 15-20-22(a)(l) is unconstitutional on four different grounds: the statute was vague on its face and as applied to the defendant; it constituted cruel and unusual punishment as applied because it punished Adams for his status as a homeless person; it violated due-process rights because it punished Adams for his failure to perform an act it was impossible for him to perform; and it violated the right to equal protection of the law because it incarcerated Adams for his indigence when other offenders who were not indigent would not be punished under the statute. The trial court stated in its order:
“This court takes no pleasure in invalidating a portion of the State’s Community Notification Act (‘CNA’). However, the statute as written creates a situation the legislature surely did not intend: that prisoners finish their sentences but face indefinite incarceration and a potentially unending string of prosecutions, not because of any new crimes against morality or an intentional choice to violate the law, but because they are indigent and homeless. The court urges the Legislature to revisit the issue of homeless sex offenders, review the approaches of other states that have tackled this issue, and develop an effective method of tracking homeless sex offenders that protects the public while not trampling on fundamental American notions of justice and fair play.”
(C. 59-60.)
We agree with the trial court that former § 15 — 20—22(a) (1) is unconstitutional, and we address here two of the reasons: first, the statute violates the guarantee to equal protection under the law as provided in the Fourteenth Amendment to the United States Constitution, and in Article I, §§ 1, 6, and 22, of the Alabama Constitution of 1901 because it resulted in an unreasonable and discriminatory classification based on wealth; and, second, the statute is unconstitutional as applied to the defendant in this case, under the Eighth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, and under Article I, § 15, Ala. Const.1901, because the requirement in former § 15-20-22(a)(l) that a sex offender provide an “actual address *739 at which he or she will reside” punishes the defendant solely for his status of being homeless[14] and, thus, violates the prohibition against cruel and unusual punishment. Equal protection violation
Although we do not find that the Alabama Legislature intended to create classifications based on wealth when it enacted the CNA, it is clear that an unintended consequence of the legislation is that indigent homeless sex offenders are treated differently from nonindigent homeless sex offenders, and that indigent homeless sex offenders who have served their prison sentences remain incarcerated solely because they have no funds with which to secure lodging and to obtain an address upon release from prison. We have found no reported case addressing this precise issue in Alabama or in any other jurisdiction. We first consider the well established doctrine of equal protection.
“The essence of that doctrine can be stated with deceptive simplicity. The Constitution does not require that things different in fact be treated in law as though they were the same. But it does require, in its concern for equality, that those who are similarly situated be similarly treated. The measure of the reasonableness of a classification is the degree of its success in treating similarly those similarly situated.”
Joseph Tussman and Jacobus tenBroek, The Equal Protection of the Laws, 37 Cal. L.Rev. 341, 344 (1948-1949), cited with approval in 3 Ronald D. Rotunda and John E. Nowak, Treatise on Const. L. — Substance & Procedure § 18.1 (4th ed. 2007).
Concerns that indigents receive equal justice have frequently been addressed by all levels of courts, and the United States Supreme Court, in Griffin v. Illinois, 351 U.S. 12, 16-17, 76 S.Ct. 585, 100 L.Ed. 891 (1956), stated:
“Providing equal justice for poor and rich, weak and powerful alike is an age-old problem. People have never ceased to hope and strive to move closer to that goal. This hope, at least in part, brought about in 1215 the royal concessions of Magna Charta: ‘To no one will we sell, to no one will we refuse, or delay, right or justice. ... No free man shall be taken or imprisoned, or disseised, or outlawed, or exiled, or anywise destroyed; nor shall we go upon him nor send upon him, but by the lawful judgment of his peers or by the law of the land.’ These pledges were unquestionably steps toward a fairer and more nearly equal application of criminal justice. In this tradition, our own constitutional guaranties of due process and equal protection both call for procedures in criminal trials which allow no invidious discriminations between persons and different groups of persons. Both equal protection and due process emphasize the central aim of our entire judicial system — all people charged with crime must, so far as the law is concerned, ‘stand on an equality before the bar of justice in every American court.’ Chambers v. Florida, 309 U.S. 227, 241, 60 S.Ct. 472, 479, 84 L.Ed. 716 [ (1940) ].”
(Footnote omitted.)
“Griffin’s principle of ‘equal justice,’ which the Court applied there to strike *740 down a state practice of granting appellate review only to persons able to afford a trial transcript, has been applied in numerous other contexts. See, e.g., Douglas v. California, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963) (indigent entitled to counsel on first direct appeal); Roberts v. LaVallee, 389 U.S. 40, 88 S.Ct. 194, 19 L.Ed.2d 41 (1967) (indigent entitled to free transcript of preliminary hearing for use at trial); Mayer v. Chicago, 404 U.S. 189, 92 S.Ct. 410, 30 L.Ed.2d 372 (1971) (indigent cannot be denied an adequate record to appeal a conviction under a fine-only statute). Most relevant to the issue here is the holding in Williams v. Illinois, 399 U.S. 235, 90 S.Ct. 2018, 26 L.Ed.2d 586 (1970), that a State cannot subject a certain class of convicted defendants to a period of imprisonment beyond the statutory maximum solely because they are too poor to pay the fine. Williams was followed and extended in Tate v. Short, 401 U.S. 395, 91 S.Ct. 668, 28 L.Ed.2d 130 (1971), which held that a State cannot convert a fine imposed under a fine-only statute into a jail term solely because the defendant is indigent and cannot immediately pay the fine in full. But the Court has also recognized limits on the principle of protecting indigents in the criminal justice system. For example, in Ross v. Moffitt, 417 U.S. 600, 94 S.Ct. 2437, 41 L.Ed.2d 341 (1974), we held that indigents had no constitutional right to appointed counsel for a discretionary appeal. In United States v. MacColl[o]m, 426 U.S. 317, 96 S.Ct. 2086, 48 L.Ed.2d 666 (1976) (plurality opinion), we rejected an equal protection challenge to a federal statute which permits a district court to provide an indigent with a free trial transcript only if the court certifies that the challenge to his conviction is not frivolous and the transcript is necessary to prepare his petition.”
Bearden v. Georgia, 461 U.S. 660, 664-65, 103 S.Ct. 2064, 76 L.Ed.2d 221 (1983). In Bearden, the United States Supreme Court held that a trial court erred “in automatically revoking probation because the [offender] could not pay his fine, without determining that [he] had not made sufficient bona fide efforts to pay or that adequate alternative forms of punishment did not exist.” 461 U.S. at 662, 103 S.Ct. 2064. See also Rinaldi v. Yeager, 384 U.S. 305, 86 S.Ct. 1497, 16 L.Ed.2d 577 (1966) (holding that the Equal Protection Clause was violated by a statute requiring unsuccessful indigent criminal appellants who were incarcerated to reimburse the state for the costs of trial transcripts).
The application of equal-protection principles to indigents in criminal cases has been thoroughly considered by the United States Supreme Court. A plurality of the Court in Griffin acknowledged the importance of appellate review in criminal cases and stated: “[T]o deny adequate review to the poor means that many of them may lose their life, liberty or property because of unjust convictions which appellate courts would set aside.” Griffin, 351 U.S. at 19. The plurality further stated: “There is no meaningful distinction between a rule which would deny the poor the right to defend themselves in a trial court and one which effectively denies the poor an adequate appellate review accorded to all who have money enough to pay the costs in advance.” 351 U.S. at 18. As Justice Frankfurter stated in Griffin:
“Law addresses itself to actualities. It does not face actuality to suggest that Illinois affords every convicted person, financially competent or not, the opportunity to take an appeal, and that it is not Illinois that is responsible for dispar *741 ity in material circumstances. Of course a State need not equalize economic conditions. A man of means may be able to afford the retention of an expensive, able counsel not within reach of a poor man’s purse. Those are contingencies of life which are hardly within the power, let alone the duty, of a State to correct or cushion. But when a State deems it wise and just that convictions be susceptible to review by an appellate court, it cannot by force of its exactions draw a line which precludes convicted indigent persons, forsooth erroneously convicted, from securing such a review merely by disabling them from bringing to the notice of an appellate tribunal errors of the trial court which would upset the conviction were practical opportunity for review not foreclosed.
“To sanction such a ruthless consequence, inevitably resulting from a money hurdle erected by a State, would justify a latter-day Anatole France to add one more item to his ironic comments on the ‘majestic equality of the law. ‘The law, in its majestic equality, forbids the rich as well as the poor to sleep under bridges, to beg in the streets, and to steal bread.’ John Cour-nos, A Modem Plutarch, p. 27.
“The State is not free to produce such a squalid discrimination.”
351 U.S. at 23 (Frankfurter, J., concurring in the judgment).
The statutory scheme at issue here produces the same type of discrimination condemned by the United States Supreme Court in Griffin and its progeny — discrimination resulting in a deprivation of a fundamental right that is based, in actuality, on poverty. The record below demonstrates that Adams, an adult criminal sex offender who had completed his sentence, attempted to comply with the requirements of the CNA by securing approved living accommodations upon completion of his sentence, but because he was indigent and homeless, he was unable to do so. Upon completion of his original sentence, he was then transported immediately from prison to the Montgomery County jail and was charged with violating the CNA based on his failure to provide “the actual address” at which he would reside upon release. Adams had completed the sentence the trial court had imposed for his commission of his original crimes. His continued incarceration was not based directly on the underlying offenses but was, instead, the result of his homelessness and indigency and the concomitant inability to secure living accommodations and to provide an address to the DOC. Thus, Adams was no longer incarcerated as a result of the original sentence for the underlying sex crimes, nor was he incarcerated for additional sex crimes or for any intentional, willful criminal act. Rather, Adams continued to be incarcerated and ultimately charged for reasons that were beyond his control — his indigency and resulting homelessness.
On its face the statute applies to all convicted sex offenders equally by requiring them to provide approved addresses in compliance with the CNA restrictions of the 45 days prior to their release from prison. On its face there is no classification of offenders — reasonable or unreasonable. All sex offenders can regain their liberty upon completion of their sentences simply by providing an address, so the State argues. In fact, however, the opportunity for an indigent homeless sex offender to secure release from confinement following completion of his sentence is virtually nil, as the testimony at the hearings in these cases demonstrated. Only homeless persons with access to funds to pay for a stay in a motel or other accommodation at an approved location will be freed from incarceration, and indigents without *742 such funds will remain incarcerated. And, because the charge for violating this provision of the CNA is a felony, indigent offenders could eventually be sentenced as habitual felons to life imprisonment without the possibility of parole solely because they have no funds to secure a place to stay upon their release from prison. All homeless indigent offenders charged with this violation would, at the end of the term of incarceration for any conviction for a CNA violation, again be required to provide an approved address and if they could not on account of their indigent circumstances, they would again be transported to the county jail upon completion of that sentence. This cycle of incarceration is potentially endless for the indigent homeless sex offender — and ultimately each would be incarcerated for life as habitual felony offenders.
Thus, the State has created separate consequences for indigent homeless offenders and for nonindigent homeless offenders. The continued deprivation of liberty following the completion of the sentence for the original sex offense is suffered by those who have no resources. Adams was not truly punished for any willful failure to comply with the CNA, but for his indigency and homelessness— matters established by the record to have been beyond his control. It is significant to note, as has the United States Supreme Court, that “the condition at issue here — indigency—is itself no threat to the safety or welfare of society.” Bearden v. Georgia, 461 U.S. 660, 669 n. 9, 103 S.Ct. 2064, 76 L.Ed.2d 221 (1983). The statutory scheme thus creates a classification based on wealth, depriving a certain class of citizens indefinitely of their liberty as a result of their inability to pay. The law, though not discriminatory on its face, is discriminatory in its application. See Griffin v. Illinois, 351 U.S. at 17 n. 11. This discrimination based on wealth, as the United States Supreme Court has held in Griffin and its progeny, is constitutionally fatal. Therefore, the statute as it was written is unconstitutional.
We are aware, as was the trial court in this case, that the intent of the Alabama Legislature — to protect the public, particularly children, from convicted sex offenders — is a vital goal. The statute the legislature enacted, however, unconstitutionally subjects indigent homeless sex offenders to a denial of their liberty based solely on their inability to pay. The State is not powerless to monitor and track homeless indigent sex offenders, but it must turn to constitutional methods to do so — methods that do not deprive defendants of their liberty based only on their inability to pay, and particularly without a determination that a defendant made efforts' to comply with the statute and failed to do so only because he or she was indigent. The State is free to develop many alternative means to avoid the inadvertent wealth classification it has created here and that still satisfy the goal of protecting the public.
While we recognize that it is not within this Court’s scope of authority to provide these alternative means because that is entirely the prerogative of the Alabama Legislature, we note that the legislatures of other states have provided for the means to monitor the whereabouts of homeless indigent sex offenders. California’s penal code includes a section providing for the registration of transient offenders; that section requires transients to register every 30 days and to report “the places where he or she sleeps, eats, works, frequents, and engages in leisure activities.” CaLPenal Code § 290.011(a) and (d).
The Florida Legislature has enacted statutory provisions defining “permanent *743 residence,” “temporary residence,” and “transient residence,” the latter being defined as:
“a place or county where a person lives, remains, or is located for a period of 5 or more days in the aggregate during a calendar year and which is not the person’s permanent or temporary address. The term includes, but is not limited to, a place where the person sleeps or seeks shelter and a location that has no specific street address.”
Fla. Stat. § 775.21(2)(d)-(m). Sex offenders are required to report in person at the sheriffs office within 48 hours of being released from the Florida Department of Corrections and within 48 hours of establishing or vacating a permanent, temporary, or transient residence. Fla. Stat. § 948.0435.
The Illinois Legislature defines a “fixed residence” as “any and all places that a sex offender resides for an aggregate period of time of 5 or more days in a calendar year,” 730 Ill. Comp. Stat. 150/2, and requires sex offenders without a fixed residence to report weekly, in person, to the local law-enforcement agency in the area in which he or she is located and to provide information about all the locations where the offender has stayed in the previous 7 days, 730 Ill. Comp. Stat. 150/3.
Indiana statutes define and include provisions for registration by sex offenders who reside in a “principal residence” or in a “temporary residence.” Ind.Code §§ 11-8-8-3, -11, -12. Section 11-8-8-12(c) of the Indiana Code provides that a sex offender who does not have a principal residence or temporary residence shall report in person to the local law-enforcement authority in the county where the sex offender resides at least once each week and to report an address for the location where he or she will be staying.
The Massachusetts Legislature recently approved statutes requiring homeless sex offenders to present themselves at the local police department every 30 days to comply with the registration requirements and to wear a global positioning system or other similar device. Mass. Gen. Laws ch. 6, § 178F 1/2 and § 178F 3/4.
The Washington State Legislature enacted several provisions requiring sex offenders who have no fixed residence to report to the county sheriffs office in person, weekly, and provide to the sheriff, if requested, an accurate accounting of where the offender stays during the week. Wash. Rev.Code § 9A.44.130.
We note, also, that several courts have reversed convictions in cases involving statutory registration of homeless sex offenders on grounds of impossibility of compliance or insufficiency of the evidence: Com. v. Wilgus, 975 A.2d 1183 (Pa.Super.Ct.2009) (“Because Wilgus’s homeless existence precluded the possibility of a residence, or fixed place of habitation or abode, we are constrained to hold Wilgus was without a ‘residence’ to register, change or verify within the meaning of Pennsylvania’s” sex-offender-registration statute); Twine v. State, 395 Md. 539, 910 A.2d 1132 (2006) (conviction for failing to provide written notice of change of residence reversed because defendant became homeless after he was evicted and, therefore, he had not acquired a “residence” or “address” within the contemplation of the registration statute); Jeandell v. State, 395 Md. 556, 910 A.2d 1141 (2006) (same); State v. Iverson, 664 N.W.2d 346 (Minn. 2003) (sex-offender-registration statute did not apply to homeless defendants who did not know where they would be living at least 5 days in advance and who could not provide an address where mail could be received); State v. Pickett, 95 Wash.App. 475, 975 P.2d 584 (1999) (“Here, the evi *744 dence is undisputed that Pickett was living on the streets, sometimes staying in parks in Everett and Seattle, sometimes on the sidewalks of downtown Seattle. Pickett’s situation is not contemplated by the statute. Because ‘residence’ and ‘residence address’ connote some permanence or intent to return to a place, it is impossible for Pickett to comply with the statute as written.”); ’ and State v. Bassett, 97 Wash. App. 737, 987 P.2d 119 (1999) (holding that the registration statute “does not require a convicted sex offender to give written notice of a ‘change of address at least fourteen days before moving’ where the offender does not know fourteen days in advance that he will be moving and he has no known residence into which to move” and holding that “living on the streets, homelessness, does not constitute a ‘residence’ within the meaning of the statute”). The Georgia Supreme Court held that a registration requirement that failed to provide direction to offenders who did not have a rural route or street address or to the authorities who would enforce the requirement was unconstitutionally vague and violated the Due Process Clauses of the Georgia and United States Constitutions. Santos v. State, 284 Ga. 514, 668 S.E.2d 676 (2008). So, too, a California Court of appeal struck down as violative of due-process principles a registration statute -that required offenders who had no residence to register their “locations,” without providing any specificity to the offenders or to the enforcing authorities for them to determine what the statute required. People v. North, 112 Cal. App.4th 621, 5 Cal.Rptr.3d 337 (2003).
Legislation providing • for the registration of all sex offenders — including those who, like the defendant in this case, are homeless and indigent — must not violate constitutional principles, but the foregoing brief survey of other States’ attempts to provide such legislation demonstrates that crafting such legislation is not a simple matter. We encourage Alabama’s Legislature to enact registration requirements that do not unfairly impact the indigent homeless who are unable because of their indigency to provide an approved address upon completion of their prison terms for the sex offenses of which they were convicted.

Eighth Amendment violation

Although we hold that the statute under which Adams was charged in this case violated equal-protection principles, we hold also that it violated the constitutional prohibitions against cruel and unusual punishment. The Eighth Amendment to the United States Constitution provides that “[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.” Article I, § 15, Ala. Const.1901, provides “[t]hat excessive fines shall not be imposed, nor cruel and unusual punishments inflicted.” The Cruel and Unusual Punishments Clause of the Eighth Amendment, and similarly of Article I, § 15, Ala. Const. 1901, “proscribes more than physically barbarous punishments,” it embodies “ ‘broad and idealistic concepts of dignity, civilized standards, humanity, and decency.’ ” Estelle v. Gamble, 429 U.S. 97, 102, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (quoting Jackson v. Bishop, 404 F.2d 571, 579 (8th Cir.1968)). As the United States Supreme Court recognized more than 50 years ago:
“The basic concept underlying the Eighth Amendment is nothing less than the dignity of man. While the State has the power to punish, the Amendment stands to assure that this power be exercised within the limits of civilized standards. ... [T]he words of the Amendment are not precise, and ... their scope is not static. The Amendment must draw its meaning from the evolv *745 ing standards of decency that mark the progress of a maturing society.”
Trop v. Dulles, 356 U.S. 86, 100-01, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) (footnote omitted). Thus:
“[T]he Cruel and Unusual Punishments Clause circumscribes the criminal process in three ways: First, it limits the kinds of punishment that can be imposed on those convicted of crimes, e.g., Estelle v. Gamble, [429 U.S. 97 (1976) ]; Trop v. Dulles, [356 U.S. 86 (1958)]; second, it proscribes punishment grossly disproportionate to the severity of the crime, e.g., Weems v. United States, [217 U.S. 349 (1910)]; and third, it imposes substantive limits on what can be made criminal and punished as such, e.g., Robinson v. California, [370 U.S. 660 (1962) ].”
Ingraham v. Wright, 430 U.S. 651, 667, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977). It is the third application — the substantive limits on what may be criminally punished— with which we deal here. Although we recognize that this third application is “one to be applied sparingly” because the Cruel and Unusual Punishments Clause of the Eighth Amendment “has always been considered, and properly so, to be directed at the method or kind of punishment imposed for the violation of criminal statutes,” id., we likewise recognize that “[a] distinction exists between applying criminal laws to punish conduct, which is constitutionally permissible, and applying them to punish status, which is not.” Joel v. City of Orlando, 232 F.3d 1353, 1361 (11th Cir.2000) (citing Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962)).
The United States Supreme Court has twice addressed whether criminal laws im-permissibly criminalized status rather than conduct. First, in Robinson, supra, a majority of the Court struck down a California statute making it illegal to “ ‘be addicted to the use of narcotics,’ ” 370 U.S. at 660, as constituting cruel and unusual punishment because the statute punished the defendant solely for the status of being an addict and not for any conduct on the part of the defendant. Six years later, in a plurality opinion in Powell v. Texas, 392 U.S. 514, 88 S.Ct. 2145, 20 L.Ed.2d 1254 (1968), the Court upheld a Texas statute making it illegal to ‘“be in a state of intoxication in any public place,’ ” 392 U.S. at 516, despite evidence indicating that the defendant was a chronic alcoholic, on the ground that the statute punished the defendant’s conduct of being intoxicated in public and not his status as an alcoholic.
Since then, courts have grappled with these two opinions in an attempt to ascertain their meaning in Eighth Amendment jurisprudence. In Jones v. City of Los Angeles, 444 F.3d 1118 (9th Cir.2006), vacated on other grounds, 505 F.3d 1006 (9th Cir.2007), the United States Court of Appeals for the Ninth Circuit engaged in a lengthy, and persuasive, analysis of Robinson and Powell to conclude that a Los Angeles municipal ordinance criminalizing “sitting, lying, or sleeping on public streets and sidewalks at all times and in all places within Los Angeles’s city limits” violated the Cruel and Unusual Punishments Clause of the Eighth Amendment as applied to six homeless individuals who had sought injunctive relief barring enforcement of the ordinance against them. 444 F.3d at 1120. We quote extensively from that opinion:
“The district court erred by not engaging in a more thorough analysis of Eighth Amendment jurisprudence under Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962), and Powell v. Texas, 392 U.S. 514, 88 S.Ct. 2145, 20 L.Ed.2d 1254 (1968), when it held that the only relevant inquiry is *746 whether the ordinance at issue punishes status as opposed to conduct, and that homelessness is not a constitutionally cognizable status.
“The district court relied exclusively on the analysis of Robinson and Powell by another district court in Joyce v. City and County of San Francisco, in which plaintiffs challenged certain aspects of San Francisco’s comprehensive homelessness program on Eighth Amendment grounds. 846 F.Supp. 843 (N.D.Cal. 1994). Joyce, however, was based on a very different factual underpinning than is present here. Called the ‘Matrix Program,’ the homelessness program was ‘ “an interdepartmental effort ... [utilizing] social workers and health workers ... [and] offering shelter, medical care, information about services and general assistance.” ’ Id. at 847 (alterations and omissions in original). One element of the program consisted of the ‘Night Shelter Referral’ program conducted by the Police Department, which handed out ‘referrals’ to temporary shelters. Id. at 848. The City demonstrated that of 3820 referral slips offered to men, only 1866 were taken and only 678 used. Id.
“The Joyce plaintiffs made only the conclusory allegation that there was insufficient shelter, id. at 849; they did not make the strong evidentiary showing of a substantial shortage of shelter Appellants make here. Moreover, the preliminary injunction plaintiffs sought in Joyce was so broad as to enjoin enforcement of prohibitions on camping or lodging in public parks and on ‘ “life-sustaining activities such as sleeping, sitting or remaining in a public place,” ’ which might also include such antisocial conduct as public urination and aggressive pan handling. Id. at 851 (emphasis added). Reasoning that plaintiffs’ requested injunction was too broad and too difficult to enforce, and noting the preliminary nature of its findings based on the record at an early stage in the proceedings, the district court denied the injunction. Id. at 851-53. The Joyce court also concluded that homelessness was not a status protectable under the Eighth Amendment, holding that it was merely a constitutionally noncognizable ‘condition.’ Id. at 857-58.
“We disagree with the analysis of Robinson and Powell conducted by both the district court in Joyce and the district court in the case at bar. The City could not expressly criminalize the status of homelessness by making it a crime to be homeless without violating the Eighth Amendment, nor can it criminalize acts that are an integral aspect of that status. Because there is substantial and undisputed evidence that the number of homeless persons in Los An-geles far exceeds the number of available shelter beds at all times, including on the nights of their arrest or citation, Los Angeles has encroached upon Appellants’ Eighth Amendment protections by criminalizing the unavoidable act of sitting, lying, or sleeping at night while being involuntarily homeless. A closer analysis of Robinson and Powell instructs that the involuntariness of the act or condition the City criminalizes is the critical factor delineating a constitutionally cognizable status, and incidental conduct which is integral to and an unavoidable result of that status, from acts or conditions that can be criminalized consistent with the Eighth Amendment.
“Our analysis begins with Robinson, which announced limits on what the state can criminalize consistent with the Eighth Amendment. In Robinson, the Supreme Court considered whether a state may convict an individual for violating a statute making it a criminal *747 offense to “‘be addicted to the use of narcotics.”’ 370 U.S. at 660, 82 S.Ct. 1417 (quoting Cal. Health & Safety Code § 11721). The trial judge had instructed the jury that
“ ‘[t]o be addicted to the use of narcotics is said to be a status or condition and not an act. It is a continuing offense and differs from most other offenses in the fact that [it] is chronic rather than acute; that it continues after it is complete and subjects the offender to arrest at any time before he reforms.... All that the People must show is ... that while in the City of Los Angeles [Robinson] was addicted to the use of narcotics.... ’
“Id. at 662-63, 82 S.Ct. 1417 (second alteration and third omission in original). The Supreme Court reversed Robinson’s conviction, reasoning:
“‘It is unlikely that any State at this moment in history would attempt to make it a criminal offense for a person to be mentally ill, or a leper, or to be afflicted with a venereal disease .... [I]n the light of contemporary human knowledge, a law which made a criminal offense of such a disease would doubtless be universally thought to be an infliction of cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments.
“ ‘We cannot but consider the statute before us as of the same category. In this Court counsel for the State recognized that narcotic addiction is an illness. Indeed, it is apparently an illness which may be contracted innocently or involuntarily. We hold that a state law which imprisons a person thus afflicted as a criminal, even though he has never touched any narcotic drug within the State or been guilty of any irregular behavior there, inflicts a cruel and unusual punishment in violation of the Fourteenth Amendment.’
“Id. at 666-67, 82 S.Ct. 1417 (citation and footnotes omitted).
“The Court did not articulate the principles that undergird its holding. At a minimum, Robinson establishes that the state may not criminalize ‘being’; that is, the state may not punish a person for who he is, independent of anything he has done. See, e.g., Powell, 392 U.S. at 533, 88 S.Ct. 2145 (Marshall, J., plurality opinion) (stating that Robinson requires an actus reus before the state may punish). However, as five Justices would later make clear in Powell, Robinson also supports the principle that the state cannot punish a person for certain conditions, either arising from his own acts or contracted involuntarily, or acts that he is powerless to avoid. Powell, 392 U.S. at 567, 88 S.Ct. 2145 (Fortas, J., dissenting) (endorsing this reading of Robinson)-, id. at 550 n. 2, 88 S.Ct. 2145 (White, J., concurring in the judgment) (same, but only where acts predicate to the condition are remote in time); see Robinson, 370 U.S. at 666-67, 82 S.Ct. 1417 (stating that punishing a person for having a venereal disease would be unconstitutional, and noting that drug addiction ‘may be contracted innocently or involuntarily’).
“Six years after its decision in Robinson, the Supreme Court considered the case of Leroy Powell, who had been charged with violating a Texas statute making it a crime to ‘ “get drunk or be found in a state of intoxication in any public place.” ’ Powell, 392 U.S. at 517, 88 S.Ct. 2145 (Marshall, J., plurality opinion) (quoting Tex. Penal Code Ann. art. 477 (Vernon 1952)). The trial court found that Powell suffered from the disease of chronic alcoholism, which ‘ “destroys the afflicted person’s will” ’ to *748 resist drinking and leads him to appear drunk in public involuntarily. Id. at 521, 88 S.Ct. 2145. Nevertheless, the trial court summarily rejected Powell’s constitutional defense and found him guilty. See id. at 558, 88 S.Ct. 2145 (Fortas, J., dissenting). On appeal to the United States Supreme Court, Powell argued that the Eighth Amendment prohibited ‘punish[ing] an ill person for conduct over which he has no control.’ Brief for Appellant at 6, Powell, 392 U.S. 514, 88 S.Ct. 2145, 20 L.Ed.2d 1254.
“In a 4-1-4 decision, the Court affirmed Powell’s conviction. The four Justices joining the plurality opinion interpreted Robinson to prohibit only the criminalization of pure status and not to limit the criminalization of conduct. Powell, 392 U.S. at 533, 88 S.Ct. 2145 (Marshall, J., plurality opinion). The plurality then declined to extend the Cruel and Unusual Punishment Clause’s protections to any involuntary conduct, citing slippery slope concerns, id. at 534-35, 88 S.Ct. 2145, and considerations of federalism and personal accountability, id. at 535-36, 88 S.Ct. 2145. Because Powell was convicted not for his status as a chronic alcoholic, but rather for his acts of becoming intoxicated and appearing in public, the Powell plurality concluded that the Clause as interpreted by Robinson did not protect him. Id. at 532, 88 S.Ct. 2145.
“In contrast, the four Justices in dissent read Robinson to stand for the proposition that ‘[cjriminal penalties may not be inflicted on a person for being in a condition he is powerless to change.’ Id. at 567, 88 S.Ct. 2145 (For-tas, J., dissenting). Applying Robinson to the facts of Powell’s case, the dissenters first described the predicate for Powell’s conviction as ‘the mere condition of being intoxicated in public’ rather than any ‘acts,’ such as getting drunk and appearing in public. Id. at 559, 88 S.Ct. 2145. Next and more significantly, the dissenters addressed the involuntariness of Powell’s behavior, noting that Powell had ‘ “an uncontrollable compulsion to drink” to the point of intoxication; and that, once intoxicated, he could not prevent himself from appearing in public places.’ Id. at 568, 88 S.Ct. 2145. Having found that the Cruel and Unusual Punishment Clause, as interpreted by Robinson, protects against the criminalization of being in a condition one is powerless to avoid, see id. at 567, 88 S.Ct. 2145, and because Powell was powerless to avoid public drunkenness, the dissenters concluded that his conviction should be reversed, see id. at 569-70, 88 S.Ct. 2145.
“In his separate opinion, Justice White rejected the plurality’s proposed status-conduct distinction, finding it similar to ‘forbidding criminal conviction for being sick with flu or epilepsy but permitting punishment for running a fever or having a convulsion.’ Id. at 548-49, 88 S.Ct. 2145 (White, J., concurring in the judgment). Justice White read Robinson to stand for the principle that ‘it cannot be a crime to have an irresistible compulsion to use narcotics,’ id. at 548, 88 S.Ct. 2145, and concluded that ‘[t]he proper subject of inquiry is whether volitional acts [sufficiently proximate to the condition] brought about the’ criminalized conduct or condition, id. at 550 n. 2, 88 S.Ct. 2145.
“Justice White concluded that given the holding in Robinson, ‘the chronic alcoholic with an irresistible urge to consume alcohol should not be punishable for drinking or being drunk.’ Id. at 549, 88 S.Ct. 2145. For those chronic alcoholics who lack homes
“ ‘a showing could be made that resisting drunkenness is impossible and *749 that avoiding public places when intoxicated is also impossible. As applied to them this statute is in effect a law which bans a single act for which they may not be convicted under the Eighth Amendment — the act of getting drunk.’
“Id. at 551, 88 S.Ct. 2145. This position is consistent with that of the Powell dissenters, who quoted and agreed with Justice White’s standard, see id. at 568 n. 31, 88 S.Ct. 2145 (Fortas, J., dissenting), and stated that Powell’s conviction should be reversed because his public drunkenness was involuntary, id. at 570, 88 S.Ct. 2145.
“Justice White’s Powell opinion also echoes his prior dissent in Robinson. In Robinson, Justice White found no Eighth Amendment violation for two reasons: First, because he did ‘not consider [Robinson’s] conviction to be a punishment for having an illness or for simply being in some status or condition, but rather a conviction for the regular, repeated or habitual use of narcotics immediately prior to his arrest,’ Robinson, 370 U.S. at 686, 82 S.Ct. 1417 & nn. 2-3 (White, J., dissenting) (discussing jury instructions regarding addiction and substantial evidence of Robinson’s frequent narcotics use in the days prior to his arrest); and second, and most importantly, for understanding his opinion in Powell, because the record did not suggest that Robinson’s drug addiction was involuntary, see id. at 685, 82 S.Ct. 1417. According to Justice White, ‘if [Robinson] was convicted for being an addict who had lost his power of self-control, I would have other thoughts about this case.’ Id.
“Justice White and the [four] Powell dissenters shared a common view .of the importance of involuntariness to the Eighth Amendment inquiry. They differed only on two issues. First, unlike the dissenters, Justice White believed Powell had not demonstrated that his public drunkenness was involuntary. Compare Powell, 392 U.S. at 553, 88 S.Ct. 2145 (White, J., concurring in the judgment) (‘[Njothing in the record indicates that [Powell] could not have done his drinking in private.... Powell had a home and wife, and if there were reasons why he had to drink in public or be drunk there, they do not appear in the record.’), with id. at 568 n. 31, 88 S.Ct. 2145 (Fortas, J., dissenting) (T believe these findings must fairly be read to encompass facts that my Brother White agrees would require reversal, that is, that for appellant Powell, “resisting drunkenness” and “avoiding public places when intoxicated” on the occasion in question were “impossible.” ’).
“Second, Justice White rejected the dissent’s attempt to distinguish conditions from acts for Eighth Amendment purposes. See id. at 550 n. 2, 88 S.Ct. 2145 (White, J., concurring in the judgment). We agree with Justice White that analysis of the Eighth Amendment’s substantive limits on criminalization ‘is not advanced by preoccupation with the label “condition.” ’ Id. One could define many acts as being in the condition of engaging in those acts, for example, the act of sleeping on the sidewalk is indistinguishable from the condition of being asleep on the sidewalk. ‘ “Being” drunk in public is not far removed in time from the acts of “getting” drunk and “going” into public,’ and there is no meaningful ‘line between the man who appears in public drunk, and that same man five minutes later who is then “being” drunk in public.’ Id. The dissenters themselves undermine their proposed distinction by suggesting that criminalizing involuntary acts that ‘typically flow from ... the disease of ehron *750 ic alcoholism’ would violate the Eighth Amendment, as well as by stating that ‘[i]f an alcoholic should be convicted for criminal conduct which is not a characteristic and involuntary part of the pattern of the disease as it afflicts him, nothing herein would prevent his punishment.’ Id. at 559 n. 2, 88 S.Ct. 2145 (Fortas, J., dissenting) (emphasis added).
“Notwithstanding these differences, five Justices in Powell understood Robinson to stand for the proposition that the Eighth Amendment prohibits the state from punishing an involuntary act or condition if it is the unavoidable consequence of one’s status or being. See id. at 548, 550 n. 2, 551, 88 S.Ct. 2145 (White, J., concurring in the judgment); id. at 567, 88 S.Ct. 2145 (Fortas, J., dissenting); see also Robert L. Misner, The New Attempt Laws: Unsuspected Threat to the Fourth Amendment, 33 Stan. L.Rev. 201, 219 (1981) (‘[T]he consensus [of White and the dissenters apparently] was that an involuntary act does not suffice for criminal liability.’). Although this principle did not determine the outcome in Powell, it garnered the considered support of a majority of the Court. Because the conclusion that certain involuntary acts could not be criminalized was not dicta, see United States v. Johnson, 256 F.3d 895, 915, 914-16 (9th Cir.2001) (en banc) (Kozin-ski, J., concurring) (narrowly defining dicta as ‘a statement [that] is made casually and without analysis, ... uttered in passing without due consideration of the alternatives, or ... merely a prelude to another legal issue that commands’ the court’s full attention), we adopt this interpretation of Robinson and the Cruel and Unusual Punishment Clause as persuasive authority. We also note that in the absence of any agreement between Justice White and the plurality on the meaning of Robinson and the commands of the Cruel and Unusual Punishment Clause, the prece-dential value of the Powell plurality opinion is limited to its precise facts. ‘When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.... ’ Marks v. United States, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) (omission in original) (internal quotation marks omitted); see also Kent Greena-walt, ‘Uncontrollable’ Actions and the Eighth Amendment: Implications of Powell v. Texas, 69 Colum. L.Rev. 927, 931 (1969) (‘[T]he dissent comes closer to speaking for a majority of the Court than does the plurality opinion.’).
“Following Robinson’s holding that the state cannot criminalize pure status, and the agreement of five Justices in Powell that the state cannot criminalize certain involuntary conduct, there are two considerations relevant to defining the Cruel and Unusual Punishment Clause’s limits on the state’s power to criminalize. The first is the distinction between pure status — the state of being — and pure conduct — the act of doing. The second is the distinction between an involuntary act or condition and a voluntary one. Accordingly, in determining whether the state may punish a particular involuntary act or condition, we are guided by Justice White’s admonition that ‘[t]he proper subject of inquiry is whether volitional acts brought about the “condition” and whether those acts are sufficiently proximate to the “condition” for it to be permissible to impose penal sanctions on the “condition.” ’ Powell, 392 U.S. at *751 550 n. 2, 88 S.Ct. 2145 (White, J., concurring in the judgment); see also Bowers v. Hardwick, 478 U.S. 186, 202 n. 2, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986) (Blackmun, J., dissenting) (quoting and endorsing this statement in discussing whether the Eighth Amendment limits the state’s ability to criminalize homosexual acts).
“The Robinson and Powell decisions, read together, compel us to conclude that enforcement of [the municipal ordinance at issue] at all times and in all places against homeless individuals who are sitting, lying, or sleeping in Los Angeles’s Skid Row because they cannot obtain shelter violates the Cruel and Unusual Punishment Clause. As homeless individuals, Appellants are in a chronic state that may have been acquired ‘innocently or involuntarily.’ Robinson, 870 U.S. at 667, 82 S.Ct. 1417. Whether sitting, lying, and sleeping are defined as acts or conditions, they are universal and unavoidable consequences of being human. It is undisputed that, for homeless individuals in Skid Row who have no access to private spaces, these acts can only be done in public. In contrast to Leroy Powell, Appellants have made a substantial showing that they are ‘unable to stay off the streets on the night[s] in question.’ Powell, 392 U.S. at 554, 88 S.Ct. 2145 (White, J., concurring in the judgment).
“In disputing our holding, the dissent veers off track by attempting to isolate the supposed ‘criminal conduct’ from the status of being involuntarily homeless at night on the streets of Skid Row. Unlike the cases the dissent relies on, which involve failure to carry immigration documents, illegal reentry, and drug dealing, the conduct at issue here is involuntary and inseparable from status — they are one and the same, given that human beings are biologically compelled to rest, whether by sitting, lying, or sleeping. The cases the dissent cites do not control our reading of Robinson and Powell where, as here, an Eighth Amendment challenge concerns the involuntariness of a criminalized act or condition inseparable from status. See Johnson, 256 F.3d at 915 (‘Where it is clear that a statement ... is uttered in passing without due consideration of the alternatives, ... it may be appropriate to re-visit the issue in a later case.’). The City and the dissent apparently believe that Appellants can avoid sitting, lying, and sleeping for days, weeks, or months at a time to comply with the City’s ordinance, as if human beings could remain in perpetual motion. That being an impossibility, by criminalizing sitting, lying, and sleeping, the City is in fact criminalizing Appellants’ status as homeless individuals.
“Similarly, applying Robinson and Powell, courts have found statutes criminalizing the status of vagrancy to be unconstitutional. For example, Goldman v. Knecht declared unconstitutional a Colorado statute making it a crime for ‘ “[a]ny person able to work and support himself’ ’ to ‘ “be found loitering or strolling about, frequenting public places, ... begging or leading an idle, immoral or profligate course of life, or not having any visible means of support.” ’ 295 F.Supp. 897, 899 n. 2, 908 (D.Colo.1969) (three-judge court); see also Wheeler v. Goodman, 306 F.Supp. 58, 59 n. 1, 62, 66 (W.D.N.C.1969) (three-judge court) (striking down as unconstitutional under Robinson a statute making it a crime to, inter alia, be able to work but have no property or ‘ “visible and known means” ’ of earning a livelihood), vacated on other grounds, 401 U.S. 987, 91 S.Ct. 1219, 28 L.Ed.2d 524 (1971). These cases establish that the *752 state may not make it an offense to be idle, indigent, or homeless in public places. Nor may the state criminalize conduct that is an unavoidable consequence of being homeless — namely sitting, lying, or sleeping on the streets of Los Angeles’s Skid Row. ...
[[Image here]]
“Homelessness is not an innate or immutable characteristic, nor is it a disease, such as drug addiction or alcoholism, But generally one cannot become a drug addict or alcoholic, as those terms are commonly used, without engaging in at least some voluntary acts (taking drugs, drinking alcohol). Similarly, an individual may become homeless based on factors both within and beyond his immediate control, especially in consideration of the composition of the homeless as a group: the mentally ill, addicts, victims of domestic violence, the unemployed, and the unemployable. That Appellants may obtain shelter on some nights and may eventually escape from homelessness does not render their status at the time of arrest any less worthy of protection than a drug addict’s or an alcoholic’s.
“Undisputed evidence in the record establishes that at the time they were cited or arrested, Appellants had no choice other than to be on the streets. Even if Appellants’ past volitional acts contributed to their current need to sit, lie, and sleep on public sidewalks at night, those acts are not sufficiently proximate to the conduct at issue here for the imposition of penal sanctions to be permissible. See Powell v. Texas, 392 U.S. 514, 550 n. 2, 88 S.Ct. 2145, 20 L.Ed.2d 1254 (1968) (White, J., concurring in the judgment). In contrast, we find no Eighth Amendment protection for conduct that a person makes unavoidable based on their own immediately proximate voluntary acts, for example, driving while drunk, harassing others, or camping or building shelters that interfere with pedestrian or automobile traffic.
“Our holding is a limited one. We do not hold that the Eighth Amendment includes a mens rea requirement, or that it prevents the state from criminalizing conduct that is not an unavoidable consequence of being homeless, such as pan handling or obstructing public thoroughfares. Cf. United States v. Black, 116 F.3d 198, 201 (7th Cir.1997) (rejecting convicted pedophile’s Eighth Amendment challenge to his prosecution for receiving, distributing, and possessing child pornography because, inter alia, defendant ‘did not show that [the] charged conduct was involuntary or uncontrollable’).
“We are not confronted here with a facial challenge to a statute, cf. Roulette v. City of Seattle, 97 F.3d 300, 302 (9th Cir.1996) (rejecting a facial challenge to a municipal ordinance that prohibited sitting or lying on public sidewalks); Tobe v. City of Santa Ana, 9 Cal.4th 1069, 1080, 40 Cal.Rptr.2d 402, 892 P.2d 1145 (1995) (finding a municipal ordinance that banned camping in designated public areas to be facially valid); nor a statute that criminalizes public drunkenness or camping, cf. Joyce v. City and County of San Francisco, 846 F.Supp. 843, 846 (N.D.Cal.1994) (program at issue targeted public drunkenness and camping in public parks); or sitting, lying, or sleeping only at certain times or in certain places within the city. And we are not called upon to decide the constitutionality of punishment when there are beds available for the homeless in shelters. Cf. Joel v. City of Orlando, 232 F.3d 1353, 1357 (11th Cir. 2000) (affirming summary judgment for the City where ‘[t]he shelter has never *753 reached its maximum capacity and no individual has been turned away for lack of space or for inability to pay the one dollar fee’).
“We hold only that, just as the Eighth Amendment prohibits the infliction of criminal punishment on an individual for being a drug addict, Robinson v. California, 370 U.S. 660, 667, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962); or for involuntary public drunkenness that is an unavoidable consequence of being a chronic alcoholic without a home, Powell, 392 U.S. at 551, 88 S.Ct. 2145 (White, J., concurring in the judgment); id. at 568 n. 31, 88 S.Ct. 2145 (Fortas, J., dissenting); the Eighth Amendment prohibits the City from punishing involuntary sitting, lying, or sleeping on public sidewalks that is an unavoidable consequence of being human and homeless without shelter in the City of Los Angeles.”
444 F.3d at 1131-38 (some emphasis added). But see Lehr v. City of Sacramento, 624 F.Supp.2d 1218 (E.D.Cal.2009) (rejecting the Jones analysis as “strain[edj” and holding that punishing the homeless for violating a municipal ordinance that prohibited “ ‘any person to camp, occupy camp facilities, or use camp paraphernalia’” or to “‘store personal property, including camp paraphernalia’ ” on public or private property did not violate the Eighth Amendment).
We agree with the Ninth Circuit Court of Appeals’ well reasoned analysis of Robinson and Powell. Read together, these opinions stand for the proposition that the Cruel and Unusual Punishments Clause of the Eighth Amendment forbids punishing criminally not only a person’s pure status, but also a person’s involuntary conduct that is inseparable from that person’s status. This is not to say that voluntary conduct that is merely closely related to or derivative of a person’s status cannot constitutionally be punished. Indeed, that is, in our view, the critical difference between Powell and Robinson. In Robinson, the statute punished the pure status of being addicted to narcotics, without regard to whether the accused had used or even been in possession of narcotics. In contrast, in Powell, the statute punished, not the status of being a chronic alcoholic, but the voluntary conduct, even though obviously related to and even derivative of the status of being a chronic alcoholic, of appearing in public while in an intoxicated state. As Justice White noted in his opinion concurring in the judgment in Powell, had the defendant in that case not only been a chronic alcoholic, but also homeless with no place to live, the statute would have constituted cruel and unusual punishment as applied to the defendant because it would have been “impossible” for the defendant to avoid either getting drunk or being in public. 392 U.S. at 551, 88 S.Ct. 2145 (White, J., concurring in the judgment).
The Jones court found the circumstances in that case to be more akin to the circumstances in Robinson than the circumstances in Powell because the ordinance in that case, as applied to the six homeless individuals involved, punished them for conduct — sitting, lying, or sleeping in public — that it was not possible for them to avoid because of their homeless status. Significant to the holding in Jones, we think, was that the evidence established that the six individuals involved were unable to obtain shelter and that there was a critical lack of available shelter space in Los Angeles, which is what rendered it impossible for those individuals to avoid sitting, lying, or sleeping in public in violation of the ordinance. See Joel, supra (upholding against cruel-and-unusual-punishment challenge a municipal ordinance making it illegal, among other things, to sleep in public, as applied to homeless, *754 where evidence established that city had homeless shelter that had never reached maximum capacity).
The circumstances here are remarkably similar to those in Jones. Former § 15-20-22(a)(l) required that all sex offenders provide an “actual address at which he or she will reside or live” upon release from prison and provided that “[a]ny” failure to do so constituted a Class C felony. As noted above, an “actual address at which he or she will reside or live” is a fixed place where a person is going to live continuously for some period after his or her release from prison and where the person can receive mail. However, for someone who does not have a fixed place where he or she lives continuously for some period and where mail can be received, it is impossible to comply with the statute. The undisputed evidence presented at the hearing in this case established that Adams was indigent, that he had no family or friends with whom he could live, and that, despite his efforts, he had not been accepted to any homeless shelter or halfway house in time to comply with the requirements of the CNA. The undisputed evidence further established that there are only four shelters and/or halfway houses in the entire state of Alabama that accept sex offenders and that those shelters/halfway houses are virtually always full to capacity. For Adams, then, the failure to provide an “actual address at which [he would] reside or live” under § 15-20-22(a)(l) was not voluntary conduct merely related to, or derivative of, the status of homelessness, but was entirely involuntary conduct that was inseparable from his status of homelessness and, thus, as applied to this defendant, § 15-20-22(a)(l) constitutes cruel and unusual punishment.[15]
We caution that we are presented here with an “as applied” challenge to § 15-20-22(a)(1) and not a “facial” challenge to § 15-20-22(a)(l). A “ ‘facial challenge’ ... is defined as ‘[a] claim that a statute is unconstitutional on its face — that is, that it always operates unconstitutionally.’ ” Board of Water & Sewer Comm’rs of Mobile v. Hunter, 956 So.2d 403, 419 (Ala. 2006) (quoting Black’s Law Dictionary 244 (8th ed.2004)). To prevail on a facial challenge to the constitutionality of a statute, it must be established “that no set of circumstances exists under which the [statute] would be valid.” United States v. Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). In contrast, an “as-applied challenge” is “a claim that a statute is unconstitutional on the facts of a particular case or in its application to a particular party.” Black’s Law Dictionary 244 (8th ed. 2004).'
We do not hold that § 15-20-22(a)(1) always operates unconstitutionally or that there are no set of circumstances under which the statute would be valid. Rather, we hold only that § 15-20-22(a)(l) *755 is unconstitutional under the specific facts in this case and as applied to this defendant. As the Supreme Court of Minnesota recognized in State v. Iverson, 664 N.W.2d 346, 353 (Minn.2003): “[A]n offender who sleeps one night on a park bench, the next under a bridge, the next at a bus stop, and so on, is in a significantly different position from an offender who lives in a shelter for three weeks or on a couch in a friend’s apartment for six months.” The first of these offenders clearly has no “actual address at which he or she will reside or live” under § 15-20-22(a)(l). On the other hand, the second of these offenders has an “actual address at which he or she will reside or live” pursuant to § 15-20-22(a)(1), whether it be a shelter or the residence of a friend of family member. The first of these offenders cannot comply with § 15-20-22(a)(l), while the second of these offenders can and must comply.
The undisputed evidence in this case established that the defendant falls within the first class of homeless offenders— those who cannot comply with the statute because they are unable to find a fixed place to live continuously for some period of time where they can receive mail. Therefore, applying § 15-20-22(a)(l) to Adams effectively punishes him for his status as a homeless individual.

Conclusion

As to Adams, § 15-20-22(a)(l) violates the principles of equal protection and it constitutes cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution and Article I, § 15, of the Alabama Constitution of 1901. Therefore, dismissal of the indictment in this case was proper, and the trial court’s judgment is affirmed.
AFFIRMED.
KELLUM and MAIN, JJ., concur. WINDOM, J., concurs in the result. WISE, P.J., recuses herself.

. Section 15-20-22(a)(l) was amended effective May 21, 2009. The amendment, among other things, changed the number of days from 45 to 180 days before release from incarceration and provides that the adult criminal sex offender must declare "the actual physical address" at which he or she will reside or live upon release.

. In doing so, we express no opinion as to the constitutional validity of any other portion of former § 15-20-22(a)(l) or of the current version of § 15-20-22(a)(l).

. This Court's unpublished memorandum in the Coppage case is also being released on this date. State v. Coppage, (No. CR-08-1726, November 5, 2010) - So.3d - (Ala.Crim. App.2010) (table).

. This Court's unpublished memorandum in the Seagle case is also being released on this date. State v. Seagle, (No. CR-08-1489, November 5, 2010) So.3d (Ala.Crim. App.2010) (table).

.At the time of the hearing, Adams had posted bond and was living in a halfway house for sex offenders.

. Seagle and Coppage also testified about their unsuccessful attempts to locate a place to live upon their release from Kilby so they would be in compliance with the residency restrictions in the CNA.

. See Act No. 96-793, Ala. Acts 1996. The original act was later repealed in its entirety and reenacted. See Act No. 99-572, Ala. Acts 1999. Several provisions in the CNA have since been amended. See Act No. 2000-728, Ala. Acts 2000; Act No. 2001-1127, Ala. Acts 2001; Act No. 2005-301, Ala. Acts 2005.

. Section 15-20-20.1, Ala.Code 1975, provides:
"The Legislature finds that the danger of recidivism posed by criminal sex offenders and that the protection of the public from these offenders is a paramount concern or interest to government. The Legislature further finds that law enforcement agencies' efforts to protect their communities, conduct investigations, and quickly apprehend criminal sex offenders are impaired by the lack of information about criminal sex offenders who live within their jurisdiction and that the lack of information shared with the public may result in the failure of the criminal justice system to identify, investigate, apprehend, and prosecute criminal sex offenders.
"The system of registering criminal sex offenders is a proper exercise of the state's police power regulating present and ongoing conduct. Comprehensive registration and periodic address verification will provide law enforcement with additional information critical to preventing sexual victimization and to resolving incidents involving sexual abuse and exploitation promptly. It will allow them to alert the public when necessary for the continued protection of the community.
"Persons found to have committed a sex offense have a reduced expectation of privacy because of the public’s interest in safety and in the effective operation of government. In balancing offender’s due process and other rights, and the interests of public security, the Legislature finds that releasing information about criminal sex offenders to law enforcement agencies and, providing access to or releasing such information about criminal sex offenders to the general public, will further the primary government interest of protecting vulnerable populations and in some instances the public, from potential harm. The Legislature further finds that residency and employment restrictions for criminal sex offenders provide additional protections to vulnerable segments of the public such as schools and child care facilities.
"Juvenile sex offenders, like their adult counterparts, pose a danger to the public. Research has shown, however, that there are significant differences between adult and juvenile criminal sexual offenders. Juveniles are much more likely to respond favorably to sexual offender treatment. Juvenile offenders have a shorter history of committing sexual offenses. They are less likely to have deviant sexual arousal patterns and are not as practiced in avoiding responsibility for their abusive behavior. Juveniles are dependent upon adults for food and shelter, as well as the emotional and practical support vital to treatment efforts. Earlier intervention increases the opportunity for success in teaching juveniles how to reduce their risk of sexually re-offending. The Legislature finds that juvenile criminal sex offenders should be subject to the Community Notification Act, but that certain precautions should be taken to target the juveniles that pose the more serious threats to the public.
"Therefore, the state policy is to assist local law enforcement agencies’ efforts to protect their communities by requiring criminal sex offenders to register, record their address of residence, to be photographed, fingerprinted, to authorize the release of necessary and relevant information about criminal sex offenders to the public, to mandate residency and employment restrictions upon criminal sex offenders, and to provide certain discretion to judges for application of these requirements as provided in this article.
"The Legislature declares that its intent in imposing certain reporting and monitoring requirements on criminal sex offenders and requiring community notification of the residence and workplace of criminal sex offenders is to protect the public, especially children, from convicted criminal sex offenders.”

. "Responsible agency" is defined, in relevant part, in § 15-20-21(11), Ala.Code 1975, as “[t]he person or government entity whose duty it is to obtain information from a criminal sex offender before release and to transmit that information to police departments or sheriffs responsible for providing community notification." Because Adams was incarcerated at Kilby, the responsible agency is the DOC.

. Although there is no dispute here that § 15 — 20—22(a)(1) requires an address that, in fact, exists, we note that "actual” is defined in Black's Law Dictionary 38 (8th ed. 2004) as "[e]xisting in fact, reality.” See also Merriam-Webster’s Collegiate Dictionary 13 (11th ed. 2003) (defining "actual,” in relevant part, as "existing in act and not merely potentially” and "existing in fact or reality”).

. The definition of "residence” is relevant here because although the term "address” must be presumed to have a different meaning than any of the other terms in the CNA, including the term "residence," a review of the entire CNA reveals that the legislature often used the term "address” in conjunction with the term "residence.” For example, in expressing its intent to aid law enforcement in protecting communities, the legislature specifically noted that a sex offender’s “address of residence ” must be supplied to law enforcement. § 15-20-20.1 (emphasis added). In requiring the DOC to notify local law enforcement of a sex offender’s information provided in compliance with § 15-20-22(a)(l), i.e., the sex offender's "actual address at which he or she will reside,” the legislature required the DOC to provide all information available to the DOC that would be necessary to monitor the sex offender, including "the offender’s declared places of residence." § 15-20-22(b) and (c) (emphasis added). In addition, in § 15-20-25, the legislature required local law-enforcement agencies to provide notification to those persons living within a certain distance of "the declared residence of the adult criminal sex offender.” (Emphasis added.) The repeated use of the term "residence” in conjunction with the term "address” in the CNA is consistent with the express qualification of the term "address” in § 15-20-22(a)(1) that the "address” be where the offender "will reside or live.” Additionally, this express qualification clearly precludes the use of a post-office box as an "address” under § 15-20-22(a)(l) because a person obviously cannot reside or live at a post-office box or at a post office. This comports with the legislative intent behind the CNA to monitor sex offenders — monitoring would be impossible if only a post-office box, and not the actual place where the offender is residing or living, could be reported as an address.

.We note that this meaning is consistent with § 15-20-24, which provides that, 60 days after a sex offender’s release from custody and at various times thereafter, the Depart *738 ment of Public Safety “shall mail a non-for-wardable verification form to the address " of the offender, § 15-20-24(a) (emphasis added), and that the verification form must be completed by the offender and “shall state that the adult criminal sex offender still resides at that address,” but that if the offender does not receive the form, the offender must report in person to the appropriate law-enforcement agency and “verify his or her residence.” § 15-20-24(b) (emphasis added).

. We also note that, even if we were to find it necessary to construe the phrase "actual address at which he or she will live or reside,” which we do not, we would still reject the State’s proposed construction because it is so broad that it defies one of the most basic rules of statutory construction — the rule of lenity. "The ‘rule of lenity' requires that “ambiguous criminal statute[s] ... be construed in favor of the accused.” ’ " Ex parte Bertram, 884 So.2d 889, 892 (Ala.2003) (quoting Castillo v. United States, 530 U.S. 120, 131, 120 S.Ct. 2090, 147 L.Ed.2d 94 (2000) (paraphrasing Staples v. United States, 511 U.S. 600, 619 n. 17, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994))). See also Ex parte Hyde, 778 So.2d 237, 239 n. 2 (Ala.2000) ("[Cjrimi-nal statutes are construed strictly against the State.”). Thus, even if we were to construe former § 15-20-22(a)(l), we would be required to do so strictly, and likely would reach the same result we have reached by simply applying the plain language of that statute.

. The State argues that the trial court erred in finding the former § 15-20-22(a)(l) constituted cruel and unusual punishment as applied to the defendant because, it says, the defendant is not being punished for his status as being homeless, but for refusing to provide a location of any public place where he could be found by law enforcement. The State’s argument in this regard is based entirely on its previous argument that this Court should construe the term "address” to mean "location” — an argument we have already rejected and need not further discuss.

. We note that our holding today and our interpretation of Robinson and Powell is buttressed by the basic law regarding criminal responsibility. Section 13A-2-3, Ala.Code 1975, specifically provides that "[t]he minimum requirement for criminal liability is the performance by a person of conduct which includes a voluntary act or the omission to perform an act which he or she is physically capable of performing." (Emphasis added.) See also W. LaFave and A. Scott, Substantive Criminal Law, § 3.3(c) (1986) ("[0]ne cannot be criminally liable for failing to do an act which he is physically incapable of performing.” (footnote omitted)). The defendant here was not physically capable of performing the required act, i.e., providing an "actual address at which he or she [would] reside or live” after release from prison, because he did not have any fixed place where he could dwell and receive mail.