BURKE, Judge.
Jay F. Vann appeals his guilty-plea conviction for failing to comply with the residence restrictions set forth in § 15-20A-11(a), Ala.Code 1975, which is part of the Alabama Sex Offender Registration and Community Notification Act (“CNA”), § 15-20A-1 et seq., Ala.Code 1975. Based on that conviction, Vann was sentenced to 10 years in prison. However, Vann was given credit for time spent incarcerated in the county jail awaiting trial, and the remainder of his sentence was suspended. He was placed on unsupervised probation for two years.
Vann is an adult sex offender who is subject to the requirements of the CNA. On September 2, 2011, Vann was released from the Jefferson County Jail, and he registered a residence in Birmingham that was not in compliance with the residence restrictions found in § 15-20A-ll(a) because the residence was within 2,000 feet of the property on which a school was located. At the time of his release, Vann was informed that he had seven days from his release to comply with the residence restrictions found in § 15-20A-ll(a) and that if he failed to comply a warrant would be issued for his arrest. Vann failed to comply with the residence restrictions found in § 15-20A-ll(a), and a warrant was issued for his arrest on September 16, 2011.
On March 9, 2012, the Jefferson County Grand Jury indicted Vann, as follows:
“The grand jury of said county charge that, before the finding of this indictment, Jay F. Vann, whose name is to the grand jury otherwise unknown, a sex offender, heretofore convicted in the Court of Common Pleas in Cuyahoga County, Ohio of the offense of Sexual Battery, and subject to the Alabama Sex Offender Registration and Community Notification Act, having been released from incarceration or conviction, if not incarcerated, pursuant to Section 10(a)(1) of said Act, did knowingly and willfully fail or refuse to comply with the residence restrictions set forth in Section 11(a) of said Act, within 7 days of release or conviction, to-wit; the residence or living accommodation of said sex offender at ... 1st Avenue South, Birmingham, Alabama 35106, is within 2000 feet of the property upon which a school or child care facility is located, ... in violation of Section 10(2), Act No. 2011-640, Code of Alabama, against the peace and dignity of the State of Alabama.”
Before Vann entered his guilty plea, he moved the trial court to dismiss the indictment against him. In that motion, Vann argued that § 15-20A-10, Ala.Code 1975, was unconstitutional on its face and that it was unconstitutional as applied to him and other indigent, homeless sex offenders. Specifically, Vann argued that the statute does not provide an exception or instructions for people who are unable to secure housing due to unavailability, that the statute is vague in that it places an impermissible amount of discretion within the hands of law enforcement and encourages selective enforcement of its requirements, and that the statute does not make any provision for indigence or require the State to provide indigent sex offenders any logistical or financial assistance in locating a residence if they are financially unable to do so. Vann contended that the statute violated his constitutional rights to due process, to equal protection, and to be free from cruel and unusual punishment. Vann also argued that the CNA coupled with other laws operate to banish individuals in violation of Art. I, § 30, Ala. Const.1901.
*854 The trial court conducted an evidentiary hearing concerning Vann’s motion to dismiss. Norman Askew, an employee of the designated community-corrections program in Jefferson County, testified that on September 9, 2011, he gave Vann information. about a place in Florida where he could possibly reside. Askew further testified that it is very difficult to find a place for sex offenders to reside in Jefferson County. Similarly, Dana McCreless, who was also an employee of the designated community-corrections program in Jefferson County, testified that it is very difficult to find a place for sex offenders to reside in or around Jefferson County.
Jason Orr, a detective for the sex-offender unit of the Jefferson County Sheriffs Department, testified that Vann did not contact the sheriffs department after his release. Detective Orr stated that the sex-offender unit is open for registrations Monday through Thursday. Detective Orr further testified that his unit has “a lot of people that have compliant homeless addresses” and that there are places in Jefferson County where homeless sex offenders can live that are compliant with the CNA. (Supp. R. 34.)
Vann testified that he had been shot in the head five times and that he has grand mal seizures, poor vision in one eye, and asthma. According to Vann, his asthma is triggered by stress and by environmental factors such as “pollen, urine, [and] feces.” (Supp. R. 69.) Vann also stated that an asthma attack can trigger a seizure. Vann testified that, due to his health problems, he received Social Security disability benefits. However, according to Vann, those benefits were not paid while he was incarcerated. Vann testified that he had “very little” money when he was released from jail on September 2, 2011. (Supp. R. 70.) Vann stated that he looked for a place to live as soon as he was released from jail. According to Vann, he visited three charitable organizations that help homeless people, but he could not reside at any of those places because he is a sex offender. Vann testified that, although he did not have a compliant residence to register, he attempted to contact the sex-offender unit on Friday, September 9, 2011; however, the sex-offender unit was closed for registrations that day. Vann admitted that he did not attempt to contact the sex-offender unit after that day.
After conducting the hearing, the trial court denied Vann’s motion to dismiss. During the guilty-plea proceeding, the State offered the following factual basis for Vann’s guilty plea:
“[Vann] having previously been convicted of sexual battery in the Court of Common Pleas in Count 2 in Cuyahoga County, Ohio, therefore, being subject to the Alabama Sex Offender Registration and Notification Act between the dates of September 2nd and September 15th, 2011, in the Birmingham Division of Jefferson County this violated that act by violating the residency requirements which would prohibit him from living within 2,000 feet of a school....”
(R. 9.)

Analysis

On appeal, Vann challenges the constitutionality of certain parts of the CNA. In considering whether a legislative act is unconstitutional, we are guided by the following principles:
“This Court ‘“should be very reluctant to hold any act unconstitutional.” ’ Ex parte D.W., 835 So.2d 186, 189 (Ala.2002) (quoting Ex parte Boyd, 796 So.2d 1092, 1094 (Ala.2001)). ‘[I]n passing upon the constitutionality of a legislative act, the courts uniformly approach the question with every presumption and in-tendment in favor of its validity, and seek to sustain rather than strike down *855 the enactment of a coordinate branch of the government.’ Alabama State Fed’n of Labor v. McAdory, 246 Ala. 1, 9, 18 So.2d 810, 815 (1944) (emphasis added). This is so, because ‘it is the recognized duty of the court to sustain the act unless it is dear beyond reasonable doubt that it is violative of the fundamental law.’ 246 Ala. at 9, 18 So.2d at 815 (emphasis added).”
McInnish v. Riley, 925 So.2d 174, 178 (Ala.2005).
Section 15-20A-10, Ala.Code 1975, provides:
“(a)(1) Immediately upon release from incarceration, or immediately upon conviction if the adult sex offender is not incarcerated, the adult sex offender shall appear in person and register all required registration information with local law enforcement in each county in which the adult sex offender resides or intends to reside, accepts or intends to accept employment, and begins or intends to begin school attendance.
“(2) An adult sex offender who registers pursuant to subdivision (1) shall have seven days from release to comply with the residence restrictions pursuant to subsection (a) of Section 15-20A-11.
“(b) Immediately upon establishing a new residence, accepting employment, or beginning school attendance, the adult sex offender shall appear in person to register with local law enforcement in each county in which the adult sex offender establishes a residence, accepts employment, or begins school attendance.
“(c)(1) Immediately upon transferring or terminating any residence, employment, or school attendance, the adult sex offender shall appear in person to notify local law enforcement in each county in which the adult sex offender is transferring or terminating residence, employment, or school attendance.
“(2) Whenever a sex offender transfers his or her residence, as provided in subdivision (1) from one county to another county, the sheriff of the county from which the sex offender is transferring his or her residence shall immediately notify local law enforcement in the county in which the sex offender intends to reside. If a sex offender transfers his or her residence, as provided in subdivision (1) from one county to another jurisdiction, the sheriff of the county from which the sex offender is transferring his or her residence shall immediately notify the chief law enforcement agency in the jurisdiction in which the sex offender intends to reside.
“(d) Immediately upon any name change, the adult sex offender shall immediately appear in person to update the information with local law enforcement in each county in which the adult sex offender is required to register.
“(e) Upon changing any required registration information the adult sex offender shall immediately appear in person and update the information with local law enforcement in each county in which the adult sex offender resides.
“(f) An adult sex offender shall appear in person to verify all required registration information during the adult sex offender’s birth month and every three months thereafter, regardless of the month of conviction, for the duration of the adult sex offender’s life with local law enforcement in each county in which the adult sex offender resides.
“(g) At the time of registration, the adult sex offender shall be provided a form explaining any and all duties and restrictions placed on the adult sex offender. The adult sex offender shall read and sign this form stating that he or she understands the duties and restrictions imposed by this chapter. If *856 the adult sex offender refuses to sign the form, the designee of the registering agency shall sign the form stating that the requirements have been explained to the adult sex offender and that the adult sex offender refused to sign.
“(h) For purposes of this section, a school includes an educational institution, public or private, including a secondary school, a trade or professional school, or an institution of higher education.
“(i) If an adult sex offender was convicted and required to register prior to July 1, 2011, then the adult sex offender shall begin quarterly registration after his or her next biannual required registration date.
“(j) Any person who violates this section shall be guilty of a Class C felony.”
Section 15-20A-ll(a), Ala.Code 1975, provides:
“No adult sex offender shall establish a residence, maintain a residence after release or conviction, or establish any other living accommodation within 2,000 feet of the property on which any school or childcare facility is located unless otherwise exempted pursuant to Sections 15-20A-23 and 15-20A-24.”
I.
First, Vann argues that § 15-20A-10 is unconstitutionally vague. Specifically, Vann argues that the statute is unconstitutionally vague because it does not state “what a defendant should do in the event his seven days fall on a day that the registration unit is closed.” (Vann’s brief, at 19.) Additionally, Vann argues that the statute is unconstitutionally vague because it “fails to explain what a sex offender must do if he is unable to find suitable housing” or “if he is unable to secure housing in the initial seven day period after release due to the unavailability of compliant housing within the county.” Id.
Concerning a constitutional challenge to a statute based on the vagueness doctrine, this has Court stated:
“‘“The doctrine of vagueness ... originates in the due process clause of the Fourteenth Amendment, see Lanzetta v. New Jersey, 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888 (1939), and is the basis for striking down legislation which contains insufficient warning of what conduct is unlawful, see United States v. National Dairy Products Corporation, 372 U.S. 29, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963).
“ ‘ “Void for vagueness simply means that criminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed. United States v. Harriss, 347 U.S. 612, 617, 74 S.Ct. 808, 811, 98 L.Ed. 989, 996 (1954). A vague statute does not give adequate ‘notice of the required conduct to one who would avoid its penalties,’ Boyce Motor Lines v. United States, 342 U.S. 337, 340, 72 S.Ct. 329, 330, 96 L.Ed. 367, 371 (1951), is not ‘sufficiently focused to forewarn of both its reach and coverage,’ United States v. National Dairy Products Corporation, 372 U.S. at 33, 83 S.Ct. at 598, 9 L.Ed.2d at 566, and ‘may trap the innocent by not providing fair warning,’ Grayned v. City of Rockford, 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222, 227-28 (1972).
“ ‘ “As the United States Supreme Court observed in Winters v. New York, 333 U.S. 507, 68 S.Ct. 665, 92 L.Ed. 840 (1948):
“ ‘ “ ‘There must be ascertainable standards of guilt. Men of common intelligence cannot be required to *857 guess at the meaning of the enactment. The vagueness may be from uncertainty in regard to persons within the scope of the act, or in regard to the applicable tests to ascertain guilt.’
“ ‘ “333 U.S. at 515-16, 68 S.Ct. at 670, 92 [L.Ed. at] 849-50 [citations omitted].”
“ ‘McCrary v. State, 429 So.2d 1121, 1123-24 (Ala.Cr.App.1982), cert, denied, 464 U.S. 913, 104 S.Ct. 273, 78 L.Ed.2d 254 (1983).’
“McCall v. State, 565 So.2d 1163, 1165 (Ala.Crim.App.1990).
“ ‘ “ ‘As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.’ Kolender v. Lawson, 461 U.S. 352 [357], 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983) (citations omitted). A statute challenged for vagueness must therefore be scrutinized to determine whether it provides both fair notice to the public that certain conduct is proscribed and minimal guidelines to aid officials in the enforcement of that proscription. See Kolender, supra; Grayned v. City of Rockford, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972).” ’
“Timmons v. City of Montgomery, 641 So.2d 1263, 1264 (Ala.Crim.App.1993), quoting McCorkle v. State, 446 So.2d 684, 685 (Ala.Crim.App.1983). However,
“ ‘ “ ‘[t]his prohibition against excessive vagueness does not invalidate every statute which a reviewing court believes could have been drafted with greater precision. Many statutes will have some inherent vagueness, for “[i]n most English words and phrases there lurk uncertainties.” Robinson v. United States, 324 U.S. 282, 286, 65 S.Ct. 666, 668, 89 L.Ed. 944 (1945). Even trained lawyers may find it necessary to consult legal dictionaries, treatises, and judicial opinions before they may say with any certainty what some statutes may compel or forbid.’ ” ’
“Sterling v. State, 701 So.2d 71, 73 (Ala.Crim.App.1997), quoting Culbreath v. State, 667 So.2d 156, 158 (Ala.Crim.App.1995), abrogated on other grounds by Hayes v. State, 717 So.2d 30 (Ala.Crim.App.1997), quoting in turn, Rose v. Locke, 423 U.S. 48, 49-50, 96 S.Ct. 243, 46 L.Ed.2d 185 (1975).
““‘Mere difficulty of ascertaining its meaning or the fact that it is susceptible of different interpretations will not render a statute or ordinance too vague or uncertain to be enforced.’” Scott & Scott, Inc. v. City of Mountain Brook, 844 So.2d 577, 589 (Ala.2002), quoting City of Birmingham v. Samford, 274 Ala. 367, 372, 149 So.2d 271, 275 (1963). The judicial power to declare a statute void for vagueness ‘should be exercised only when a statute is so incomplete, so irreconcilably conflicting, or so vague or indefinite, that it cannot be executed, and the court is unable, by the application of known and accepted rules of construction, to determine, with any reasonable degree of certainty, what the legislature intended.’ Jansen v. State ex rel. Downing, 273 Ala. 166, 170, 137 So.2d 47, 50 (1962).”
Vaughn v. State, 880 So.2d 1178, 1194-96 (Ala.Crim.App.2003).
Vann states that § 15-20A-10 is unconstitutionally vague because, he says, it fails to set forth provisions for certain scenarios that could occur. Specifically, Vann states that “the statute makes no provisions for the panoply of events that *858 could cause an individual to be unable to comply with the requirement such as the unavailability of housing for indigent and homeless sex offenders, lack of funds to secure housing, and the failure of the sex offender unit to be open on the day the individual is required to report his compliance.” (Vann’s brief, at 20.) Vann also argues that the CNA is unconstitutionally vague because, he says, it fails to adequately define key terms. Specifically, Vann argues that the CNA fails to adequately define what constitutes a “residence.” Furthermore, Vann argues that the CNA’s failure to set forth provisions for certain scenarios that could occur and to adequately define certain terms could lead to arbitrary enforcement of the CNA by law-enforcement officials.
We find Vann’s arguments unconvincing. It appears that Vann’s main argument is that he was unable to comply with § 15-20A-10 due to his indigence and homelessness. However, when a person can reasonably understand what conduct is proscribed by a statute, his or her inability to comply with the statute does not amount to the statute being vague. Furthermore, a statute is not unconstitutionally vague simply because it fails to provide for every possible contingency that might arise. Section 15-20A-10 specifically states that a sex offender must register a residence upon release and that the sex offender has seven days from his or her release to comply with the residence restrictions found in § 15-20A-ll(a). Section 15-20A-11 sets forth clear residency restrictions. We hold that those statutes contain sufficient warnings of what conduct is unlawful and that a person can reasonably understand what conduct is proscribed by those statutes; thus, they are not unconstitutionally vague.
Also, Vann’s argument that § 15-20A-10(a)(2) is unconstitutionally vague because it fails to instruct the sex offender what to do if the seventh day after his or her release falls on a day when the registration office is closed is irrelevant in the present case. “[A] defendant who challenges a statute on the grounds of vagueness ‘must demonstrate that the statute under attack is vague as applied, to his own conduct, regardless of the potentially vague applications to others.’” Senf v. State, 622 So.2d 435, 437 (Ala.Crim.App.1993) (quoting Aiello v. City of Wilmington, 623 F.2d 845, 850 (3d Cir.1980)). There is no evidence indicating that Vann was in compliance with the residence restrictions on the seventh day after his release or that he attempted to register a compliant residence the first day the registration office was open after the seventh day had passed. In fact, the warrant for Vann’s arrest was not issued until September 16, 2011; thus, the sex-offender unit was open for registrations for four days after the seventh day had passed, and Vann did not attempt to register on any of those days. Therefore, the fact that the seventh day after Vann’s release fell on a day when the registration office was closed is irrelevant in the present situation.
Vann also argues that the CNA is unconstitutionally vague because, he says, it “fails to address what a person must do to comply with the statute if he is unable to provide the required information due to homelessness and indigence.” (Vann’s brief, at 26.) However, § 15-20A-12, Ala. Code 1975, specifically instructs a homeless sex offender how to comply with the registration requirements. Section 15-20A-12 states:
“(a) An adult sex offender who no longer has a fixed residence shall be considered homeless and shall appear in person and report such change in fixed residence to local law enforcement where he or she is located immediately upon such change in fixed residence.
*859 “(b) In addition to complying with the registration and verification requirements pursuant to Section 15-20A-10, a homeless adult sex offender who lacks a fixed residence, or who does not provide an address at a fixed residence at the time of release or registration, shall report in person once every seven days to local law enforcement where he or she resides. The weekly report shall be on a day specified by local law enforcement and shall occur during normal business hours.
“(c) A homeless adult sex offender who lacks a fixed address shall comply with the residence restrictions set forth in Section 15-20A-11.
“(d)(1) Each time a homeless adult sex offender reports under this section, he or she shall provide all of the following information:
“a. Name.
“b. Date of birth.
“c. Social Security number.
“d. A detailed description of the location or locations where he or she has resided during the week.
“e. A list of the locations where he or she plans to reside in the upcoming week with as much specificity as possible.
“(2) The registering agency is not required to obtain the remaining required registration information from the homeless adult sex offender each time he or she reports to the registering agency unless the homeless adult sex offender has any changes to the remaining required registration information.
“(e) If an adult sex offender who was homeless obtains a fixed address in compliance with the provisions of Section 15-20A-11, the adult sex offender shall immediately appear in person to update the information with local law enforcement in each county of residence.
“(f) Any person who violates this section shall be guilty of a Class C felony.”
Those instructions are' well-defined. Contrary to the argument set forth by Vann in his brief, the present situation is not like the situation in Santos v. State, 284 Ga. 514, 668 S.E.2d 676 (2008). In Santos, the Georgia Supreme Court held that Georgia’s statutory requirement of registering a change of residence was unconstitutionally vague as applied to homeless sex offenders who possessed no street or route address for their residence. The statute required that the sex offender register the address of his or her residence. The statute “define[d] the term ‘address’ as ‘the street or route address of the sexual offender’s residence’ and specifically state[d] that for purposes of the Code section, ‘the term does not mean a post office box, and homeless does not constitute an address.’ ” Santos, 284 Ga. at 515, 668 S.E.2d at 678. The Georgia Supreme Court held that the statute was unconstitutionally vague because it “contain[ed] no objective standard or guidelines that would put homeless sexual offenders without a street or route address on notice of what conduct is required of them, thus leaving them to guess as to how to achieve compliance with the statute’s reporting provisions.” Santos, 284 Ga. at 516, 668 S.E.2d at 678.
Unlike the statute at issue in Santos, the CNA specifically states what is required of homeless sex offenders who do not have a fixed residence. Under the CNA, in addition to complying with the registration requirements of § 15-20A-10 and the residence restrictions set forth in § 15-20A-11, a homeless sex offender who lacks a fixed residence must report in person once every seven days to local law-enforcement officials where he or she resides and provide them with specific information, including “a detailed description of the location *860 or locations where he or she has resided during the week” and “a list of the locations where he or she plans to reside in the upcoming week with as much specificity as possible.”
Further, contrary to Vann’s contention and contrary to the statute at issue in Santos, the CNA specifically defines the term “residence” in § 15-20A-4(20), Ala. Code 1975, as follows:
“Each fixed residence or other place where a person resides, sleeps, or habitually lives or will reside, sleep, or habitually live. If a person does not reside, sleep, or habitually live in a fixed residence, residence means a description of the locations where the person is stationed regularly, day or night, including any mobile or transitory living quarters or locations that have no specific mailing or street address. Residence shall be construed to refer to the places where a person resides, sleeps, habitually lives, or is stationed with regularity, regardless of whether the person declares or characterizes such place as a residence.”
Thus, under the CNA, unlike the situation in Santos, it is not necessary for a homeless sex offender to provide a specific street or route address of his or her residence. Instead, he or she can describe the location where he or she is regularly stationed.
Likewise, to the extent law-enforcement officials exercise some degree of discretion in enforcing the CNA, it does not render the CNA unconstitutionally vague. This Court has stated:
“A criminal statute is not unconstitutionally vague if it allows for some degree of discretionary enforcement by police. As previously stated, in order to satisfy the Fourteenth Amendment of the United States Constitution, a criminal statute must provide ‘minimal guidelines to aid officials in the enforcement of that proscription.’ See Vaughn [v. State], 880 So.2d [1178,] 1195 [ (Ala.Crim.App.2003) ], quoting Timmons [v. City of Montgomery], 641 So.2d [1263,] 1264 [(Ala.Crim.App.1993) ].”
Powell v. State, 72 So.3d 1268, 1280 (Ala.Crim.App.2011).
In the present case, Detective Orr testified that if a sex offender stays in contact with the sex-offender unit and is putting forth a good-faith effort to try to find a compliant address, the officers may give the sex offender more than seven days to comply with the residence restrictions. (Supp. R. 18-19.) We hold that the fact that the officers may exercise some discretion in enforcing the statute does not render the statute unconstitutionally vague. Considering that law-enforcement officers do not have unlimited resources, it is reasonable to conclude that they would focus their efforts on locating and arresting sex offenders that are not in contact with the sex-offender unit and that are not attempting to comply with the CNA. In any event, § 15-20A-10(a) clearly directs that a sex offender “shall have seven days from release to comply with the residence restrictions.” At the very least, that direction qualifies as a minimal guideline; thus, the statute is not unconstitutionally vague.
II.
Next, Vann argues that § 15-20A-10, Ala.Code 1975, violates the Eighth Amendment’s prohibition against cruel and unusual punishment[1] because, he says, the statute penalizes him for his status as an indigent homeless person. Specifically, Vann states that
*861 “because of his status, Mr. Vann cannot comply with Ala.Code § 15-20A-10. His lack of compliance is completely involuntary and a direct result of his status as an indigent, homeless sex offender.”
(Vann’s brief, at 35-36.)
This Court has stated that
“the Cruel and Unusual Punishments Clause of the Eighth Amendment forbids punishing criminally not only a person’s pure status, but also a person’s involuntary conduct that is inseparable from that person’s status. This is not to say that voluntary conduct that is merely closely related to or derivative of a person’s status cannot constitutionally be punished. Indeed, that is, in our view, the critical difference between Powell [v. State of Texas, 392 U.S. 514 (1968),] and Robinson [v. California, 370 U.S. 660 (1962) ]. In Robinson, the statute punished the pure status of being addicted to narcotics, without regard to whether the accused had used or even been in possession of narcotics. In contrast, in Powell, the statute punished, not the status of being a chronic alcoholic, but the voluntary conduct, even though obviously related to and even derivative of the status of being a chronic alcoholic, of appearing in public while in an intoxicated state. As Justice White noted in his opinion concurring in the judgment in Powell, had the defendant in that case not only been a chronic alcoholic, but also homeless with no place to live, the statute would have constituted cruel and unusual punishment as applied to the defendant because it would have been ‘impossible’ for the defendant to avoid either getting drunk or being in public. 392 U.S. at 551, 88 S.Ct. 2145 (White, J., concurring in the judgment).”
State v. Adams, 91 So.3d 724, 753 (Ala.Crim.App.2010).
In Adams, the defendant argued that a portion of former § 15-20-22(a)(l), Ala. Code 1975, which was part of the CNA, was unconstitutional. That statute required an adult criminal sex offender to provide the Alabama Department of Corrections, at least 45 days prior to the offender’s release from custody, “the actual address at which he or she will reside or live upon release.” This Court found that the plain meaning of “the phrase ‘actual address at which he or she will live or reside’ means a fixed place where one lives continuously for a period and where mail can be received.” Adams, 91 So.3d at 737. This Court then held that former § 15-20-22(a)(1) violated the constitutional prohibitions against cruel and unusual punishment as applied to the defendant because the defendant was a homeless sex offender “who [could not] comply with the statute because [he was] unable to find a fixed place to live continuously for some period of time where [he] could receive mail.” Adams, 91 So.3d at 755.
Contrary to Vann’s argument and unlike the defendant in Adams, Vann was punished based on his conduct, not his status. Although Vann may have been indigent and homeless, he has not shown that his status as an indigent homeless offender made it impossible for him to comply with the CNA. Vann was convicted of failing to comply with the residence restrictions set forth in § 15-20A-ll(a) within seven days from his release. Unlike former § 15-20-22(a)(1), the current provisions of the CNA do not require that the sex offender find a fixed place to live continuously for some period where he can receive mail. A homeless sex offender can comply with § 15-20A-10(a) by registering a “residence” within seven days from release that complies with the residence restrictions set *862 forth in § 15-20A-ll(a). It is possible for a homeless sex offender to comply with those statutes because his or her “residence” can be any “place where [he or she] resides, sleeps, or habitually lives or will reside, sleep, or habitually live,” and “if [he or she] does not reside, sleep, or habitually live in a fixed residence, residence means a description of the locations where [he or she] is stationed regularly, day or night, including any mobile or transitory living quarters or locations that have no specific mailing or street address.” § 15-20A-4(20), Ala.Code 1975. In fact, Detective Orr testified that his unit has “a lot of people that have compliant homeless addresses” and that there are places in Jefferson County where homeless sex offenders can live that are compliant with the CNA. Again, the sex offender is not required to provide a specific street or route address of a fixed place to live where mail can be received, which would be impossible for an indigent homeless offender. Vann has not shown that fulfilling the residence requirements of the CNA are impossible due to his status as an indigent homeless offender or due to involuntary conduct that is inseparable from his status as an indigent homeless offender; thus, he has not shown that enforcement of the CNA constitutes cruel and unusual punishment as applied to him.
III.
Next, in a similar argument, Vann argues that punishing him for failing to comply with § 15-20A-10 is contrary to the fundamental fairness required by the Due Process Clause of the Fourteenth Amendment to the United States Constitution because, he says, it is impossible for him to comply with the statute.
As this Court has previously stated:
“Both the Alabama and United States Constitutions protect a citizen of this state from being deprived of life or liberty without ‘due process of law.’ Ala. Const, of 1901, Art. I, § 6; U.S. Const. Amend. XIV. The phrase ‘due process of law,’ although incapable of a precise definition, in its most basic sense encompasses the observation of that degree of fundamental fairness that is essential to our concept of justice.”
Ex parte Frazier, 562 So.2d 560, 565 (Ala.1989).
To support his argument, Vann primarily relies on Bearden v. Georgia, 461 U.S. 660, 103 S.Ct. 2064, 76 L.Ed.2d 221 (1983), in which the United States Supreme Court applied the principle of “fundamental fairness” to hold that the trial court could not revoke an indigent defendant’s probation and imprison him based solely on his failure to pay a fine absent the court’s finding that he was somehow responsible for the failure or that alternative forms of punishment were inadequate to meet the state’s interest in punishment and deterrence. However, the Court also noted:
“We do not suggest that, in other contexts, the probationer’s lack of fault in violating a term of probation would necessarily prevent a court from revoking probation. For instance, it may indeed be reckless for a court to permit a person convicted of driving while intoxicated to remain on probation once it becomes evident that efforts at controlling his chronic drunken driving have failed. Cf. Powell v. Texas, 392 U.S. 514 (1968); Robinson v. California, 370 U.S. 660 (1962). Ultimately, it must be remembered that the sentence was not imposed for a circumstance beyond the probationer’s control ‘but because he had committed a crime.’ Williams [v. Illinois ], supra, 399 U.S. [235], at 242 [(1970) ]. In contrast to a condition like chronic drunken driving, however, the condition at issue here — indigency—is *863 itself no threat to the safety or welfare of society.”
Bearden, 461 U.S. at 668 n. 9.
In the present case, unlike the situation in Bearden, Vann has not been imprisoned for failure to pay a fíne and his indigence is not the main condition at issue. As this Court has previously recognized, “[t]he primary purpose of the CNA is to protect the public, particularly children, from sex offenders by gathering and disseminating information about sex offenders both to law-enforcement agencies and to the communities in which sex offenders are living and/or working.”[2] Adams, 91 So.3d at 733. Thus, Vann’s failure to comply with the registration requirements of the CNA involved the safety of the community. Unlike the situation in Bearden, in the present case there are considerations other than Vann’s ability to pay a fíne, and those considerations directly involve “threat[s] to the safety or welfare of society.” 461 U.S. at 668 n. 9. Although Vann may have difficulty complying with the registration requirements, those requirements serve a different purpose than paying a fine. Therefore, this case is distinguishable from Bearden, and we find that punishing Vann for failing to comply with the CNA is not contrary to the fundamental fairness required by the Due Process Clause of the Fourteenth Amendment.
IV.
Next, Vann argues that “§ 15-20A-10, Ala.Code 1975, denies Mr. Vann, and indigent, homeless sex offenders in general, equal protection under the law because it subjects those individuals to a continuous cycle of prosecution while others with financial means are spared.” (Vann’s brief, at 41-42.)
*864 In Bearden, concerning equal protection, the United States Supreme Court stated:
“This Court has long been sensitive to the treatment of indigents in our criminal justice system. Over a quarter-century ago, Justice Black declared that ‘there can be no equal justice where the kind of trial a man gets depends on the amount of money he has.’ Griffin v. Illinois, 351 U.S. 12, 19, (1956) (plurality opinion). Griffin’s principle of ‘equal justice,’ which the Court applied there to strike down a state practice of granting appellate review only to persons able to afford a trial transcript, has been applied in numerous other contexts. See, e.g., Douglas v. California, 372 U.S. 353 (1963) (indigent entitled to counsel on first direct appeal); Roberts v. LaVallee, 389 U.S. 40 (1967) (indigent entitled to free transcript of preliminary hearing for use at trial); Mayer v. Chicago, 404 U.S. 189 (1971) (indigent cannot be denied an adequate record to appeal a conviction under a fine-only statute). Most relevant to the issue here is the holding in Williams v. Illinois, 399 U.S. 235 (1970), that a State cannot subject a certain class of convicted defendants to a period of imprisonment beyond the statutory maximum solely because they are too poor to pay the fíne. Williams was followed and extended in Tate v. Short, 401 U.S. 395 (1971), which held that a State cannot convert a fíne imposed under a fine-only statute into a jail term solely because the defendant is indigent and cannot immediately pay the fine in full. But the Court has also recognized limits on the principle of protecting indigents in the criminal justice system. For example, in Ross v. Moffitt, 417 U.S. 600 (1974), we held that indigents had no constitutional right to appointed counsel for a discretionary appeal. In United States v. MacColl[o]m 426 U.S. 317 (1976) (plurality opinion), we rejected an equal protection challenge to a federal statute which permits a district court to provide an indigent with a free trial transcript only if the court certifies that the challenge to his conviction is not frivolous and the transcript is necessary to prepare his petition.”
Bearden, 461 U.S. at 664-65.
In Adams, this Court stated:
“The application of equal-protection principles to indigents in criminal cases has been thoroughly considered by the United States Supreme Court. A plurality of the Court in Griffin [v. Illinois, 351 U.S. 12 (1956)] acknowledged the importance of appellate review in criminal cases and stated: ‘[T]o deny adequate review to the poor means that many of them may lose their life, liberty or property because of unjust convictions which appellate courts would set aside.’ Griffin, 351 U.S. at 19. The plurality further stated: ‘There is no meaningful distinction between a rule which would deny the poor the right to defend themselves in a trial court and one which effectively denies the poor an adequate appellate review accorded to all who have money enough to pay the costs in advance.’ 351 U.S. at 18. As Justice Frankfurter stated in Griffin:
“ ‘Law addresses itself to actualities. It does not face actuality to suggest that Illinois affords every convicted person, financially competent or not, the opportunity to take an appeal, and that it is not Illinois that is responsible for disparity in material circumstances. Of course a State need *865 not equalize economic conditions. A man of means may be able to afford the retention of an expensive, able counsel not within reach of a poor man’s purse. Those are contingencies of life which are hardly within the power, let alone the duty, of a State to correct or cushion. But when a State deems it wise and just that convictions be susceptible to review by an appellate court, it cannot by force of its exactions draw a line which precludes convicted indigent persons, forsooth erroneously convicted, from securing such a review merely by disabling them from bringing to the notice of an appellate tribunal errors of the trial court which would upset the conviction were practical opportunity for review not foreclosed.
“ ‘To sanction such a ruthless consequence, inevitably resulting from a money hurdle erected by a State, would justify a latter-day Anatole France to add one more item to his ironic comments on the “majestic equality” of the law. “The law, in its majestic equality, forbids the rich as well as the poor to sleep under bridges, to beg in the streets, and to steal bread.” John Cournos, A Modem Plutarch, p. 27.
“ ‘The State is not free to produce such a squalid discrimination.’
“351 U.S. at 23 (Frankfurter, J., concurring in the judgment).”
Adams, 91 So.3d at 740-41.
This Court then found that the former CNA violated the doctrine of equal protection, stating:
“The statutory scheme at issue here produces the same type of discrimination condemned by the United States Supreme Court in Griffin and its progeny — discrimination resulting in a deprivation of a fundamental right that is based, in actuality, on poverty. The record below demonstrates that Adams, an adult criminal sex offender who had completed his sentence, attempted to comply with the requirements of the CNA by securing approved living accommodations upon completion of his sentence, but because he was indigent and homeless, he was unable to do so. Upon completion of his original sentence, he was then transported immediately from prison to the Montgomery County jail and was charged with violating the CNA based on his failure to provide ‘the actual address’ at which he would reside upon release. Adams had completed the sentence the trial court had imposed for his commission of his original crimes. His continued incarceration was not based directly on the underlying offenses but was, instead, the result of his homelessness and indigency and the concomitant inability to secure living accommodations and to provide an address to the [Department of Corrections]. Thus, Adams was no longer incarcerated as a result of the original sentence for the underlying sex crimes, nor was he incarcerated for additional sex crimes or for any intentional, willful criminal act. Rather, Adams continued to be incarcerated and ultimately charged for reasons that were beyond his control — his indigency and resulting homelessness.
“On its face the statute applies to all convicted sex offenders equally by requiring them to provide approved addresses in compliance with the CNA restrictions of the 45 days prior to their release from prison. On its face there is no classification of offenders — reasonable or unreasonable. All sex offenders can regain their liberty upon completion of their sentences simply by providing an address, so the State argues. In fact, however, the opportunity for an indigent homeless sex offender to secure release *866 from confinement following completion of his sentence is virtually nil, as the testimony at the hearings in these cases demonstrated. Only homeless persons with access to funds to pay for a stay in a motel or other accommodation at an approved location will be freed from incarceration, and indigents without such funds will remain incarcerated. And, because the charge for violating this provision of the CNA is a felony, indigent offenders could eventually be sentenced as habitual felons to life imprisonment without the possibility of parole solely because they have no funds to secure a place to stay upon their release from prison. All homeless indigent offenders charged with this violation would, at the end of the term of incarceration for any conviction for a CNA violation, again be required to provide an approved address and if they could not on account of their indigent circumstances, they would again be transported to the county jail upon completion of that sentence. This cycle of incarceration is potentially endless for the indigent homeless sex offender — and ultimately each would be incarcerated for life as habitual felony offenders.
“Thus, the State has created separate consequences for indigent homeless offenders and for nonindigent homeless offenders. The continued deprivation of liberty following the completion of the sentence for the original sex offense is suffered by those who have no resources. Adams was not truly punished for any willful failure to comply with the CNA, but for his indigency and homelessness — matters established by the record to have been beyond his control. It is significant to note, as has the United States Supreme Court, that ‘the condition at issue here — indigency—is itself no threat to the safety or welfare of society.’ Bearden v. Georgia, 461 U.S. 660, 669 n. 9, 103 S.Ct. 2064, 76 L.Ed.2d 221 (1983). The statutory scheme thus creates a classification based on wealth, depriving a certain class of citizens indefinitely of their liberty as a result of their inability to pay. The law, though not discriminatory on its face, is discriminatory in its application. See Griffin v. Illinois, 351 U.S. at 17 n. 11. This discrimination based on wealth, as the United States Supreme Court has held in Griffin and its progeny, is constitutionally fatal. Therefore, the statute as it was written is unconstitutional.”
Adams, 91 So.3d at 741-42.
In the present situation, the current CNA does not violate the doctrine of equal protection as applied to indigent homeless sex offenders. Although offenders without financial means might find it more difficult to comply with the CNA, they are able to comply with the CNA. Unlike the indigent offender in Adams, Vann was not required to provide an “actual address,” which an indigent homeless offender would not be able to do. As discussed earlier, § 15-20A-12 of the CNA makes provision for those offenders whose indigence results in homelessness. Also, under the current CNA, a homeless offender can describe the location where he or she is regularly stationed rather than being required to provide a specific street or route address for his or her residence.
One of Vann’s witnesses, Dana McCreless, testified that, although it was significantly more difficult to find a residence for indigent homeless offenders, it was not impossible to find a residence for them. Specifically, she testified:
“[Vann’s attorney]: In the time that you have worked there, has there been a difference in your success rate as far as getting a place to stay with those that have money and those that do not?
“[McCreless]: Sex offenders?
“[Vann’s attorney]: Well, yeah.
*867 “[McCreless]: Ones that are working or have money or their families can help, yes, it’s much easier. Ones that are homeless, I’ve never been able to find— I can’t say never. Very few times have I ever been able to find them a place to stay.
“[Vann’s attorney]: About how many people have you worked with that are sex offenders?
“[McCreless]: A year?
“(Vann’s attorney]: Uh-huh.
“[McCreless]: 40 to 50.
“(Vann’s attorney]: And in an average year, how many of those folks have you successfully found a placement for?
“[McCreless]: Homeless or both?
“[Vann’s attorney]: Homeless and poor, unable to provide funds, sex offenders?
“[McCreless]: Ten or less.”
(Supp. R. 59-60.)
We hold that evidence indicating that as many as 10 indigent offenders out of a total of 40 to 50 offenders could find “a place to stay” does not indicate that indigent offenders are unable to comply with the CNA. Such evidence indicates only that a significant number of indigent offenders are able to find compliant housing. Furthermore, it is not necessary to find compliant housing in order to comply with the CNA. Those indigent offenders who are unable to find compliant housing and are homeless can comply with the CNA through § 15-20A-12. Therefore, unlike the situation in Adams, the opportunity for an indigent sex offender to comply with the current CNA is not “virtually nil.”
Further, while discussing the doctrine of equal protection in Adams, this Court cited with approval statutes from other jurisdictions that “have provided for the means to monitor the whereabouts of homeless indigent sex offenders.” Adams, 91 So.3d at 742. Specifically, this Court cited the following:
“California’s penal code includes a section providing for the registration of transient offenders; that section requires transients to register every 30 days and to report ‘the places where he or she sleeps, eats, works, frequents, and engages in leisure activities.’ Cal.Penal Code § 290.011(a) and (d).
“The Florida Legislature has enacted statutory provisions defining ‘permanent residence,’ ‘temporary residence,’ and ‘transient residence,’ the latter being defined as:
“ ‘a place or county where a person lives, remains, or is located for a period of 5 or more days in the aggregate during a calendar year and which is not the person’s permanent or temporary address. The term includes, but is not limited to, a place where the person sleeps or seeks shelter and a location that has no specific street address.’
“Fla. Stat. § 775.21(2)(d)-(m). Sex offenders are required to report in person at the sheriffs office within 48 hours of being released from the Florida Department of Corrections and within 48 hours of establishing or vacating a permanent, temporary, or transient residence. Fla. Stat. § 943.0435.
“The Illinois Legislature defines a ‘fixed residence’ as ‘any and all places that a sex offender resides for an aggregate period of time of 5 or more days in a calendar year,’ 730 Ill. Comp. Stat. 150/2, and requires sex offenders without a fixed residence to report weekly, in person, to the local law-enforcement agency in the area in which he or she is located and to provide information about all the locations where the offender has stayed in the previous 7 days, 730 Ill. Comp. Stat. 150/3.
“Indiana statutes define and include provisions for registration by sex offenders who reside in a ‘principal residence’ *868 or in a ‘temporary residence.’ Ind.Code §§ 11-8-8-3, -11, -12. Section 11-8-8-12(c) of the Indiana Code provides that a sex offender who does not have a principal residence or temporary residence shall report in person to the local law-enforcement authority in the county where the sex offender resides at least once each week and to report an address for the location where he or she will be staying.
“The Massachusetts Legislature recently approved statutes requiring homeless sex offenders to present themselves at the local police department every 30 days to comply with the registration requirements and to wear a global positioning system or other similar device. Mass. Gen. Laws ch. 6, § 178F 1/2 and § 178F 3/4.
“The Washington State Legislature enacted several provisions requiring sex offenders who have no fixed residence to report to the county sheriffs office in person, weekly, and provide to the sheriff, if requested, an accurate accounting of where the offender stays during the week. Wash. Rev.Code § 9A.44.130.”
Adams, 91 So.3d at 742-43.
Alabama’s current CNA contains provisions very similar to the ones endorsed in Adams. Like those statutes, the current CNA offers a way for indigent offenders to comply if their indigence results in homelessness. Under § 15-20A-12, a homeless sex offender can report in person once every seven days to local law-enforcement officials and provide them with certain information, including “a detailed description of the location or locations where he or she has resided during the week” and “a list of the locations where he or she plans to reside in the upcoming week with as much specificity as possible.” Those provisions provide a way for the State to monitor the whereabouts of homeless sex offenders— something the Legislature has deemed necessary — without violating the doctrine of equal protection.
It is simply not the State’s duty or purpose to equalize the economic conditions for all the people who are required to comply with its statutes. However, under the doctrine of equal protection, the State cannot make a law that can be observed only by those who have financial means. Such is not the case with the CNA. Although indigent offenders might find it significantly more difficult to comply with the CNA, they can comply with the CNA; thus, the CNA does not violate the doctrine of equal protection as applied to indigent homeless sex offenders.
V.
Finally, Vann argues that § 15-20A-10, Ala.Code 1975, coupled with two local laws pertaining to Jefferson County — Act No. 2007-450, Ala. Acts 2007, and Act No. 2010-515, Ala. Acts 2010, — operate to banish sex offenders from Jefferson County in violation of Art. I, § 30, Ala. Const.1901, which states, in part, that “no citizen shall be exiled.”
In addition to the requirements of § 15-20A-10, Ala.Code 1975, Act No. 2007-450 provides that “no adult or unrelated juvenile criminal sex offender shall establish a residence or other living accommodation in a residence where another criminal sex offender resides whose name appears on the Jefferson County Sheriff’s official published sex offender list,” and Act No. 2010-515 provides that “no more than one adult criminal sex offender whose name appears on the Jefferson County Sheriff’s official published sex offender list may establish residence or other living accommodations in any apartment complex unless there is a distance of 100 yards or more from the residence in the apartment complex of any other adult criminal sex offender.”
“Banishment” or “exile” has generally been defined as “ ‘a punishment inflicted *869 on criminals, by compelling them to quit a city, place, or country, for a specific period of time, or for life.’” McBride v. State, 484 S.W.2d 480, 483 (Mo.1972) (quoting 8 C.J.S. Banishment p. 593). The Iowa Supreme Court has aptly stated that “true banishment goes beyond the mere restriction of ‘one’s freedom to go or remain where others have the right to be: it often works a destruction on one’s social, cultural, and political existence.’ ” State v. Seering, 701 N.W.2d 655, 667 (Iowa 2005) (quoting Poodry v. Tonawanda Band of Seneca Indians, 85 F.3d 874, 897 (2d Cir.1996)). In Seering, the Iowa Supreme Court held that Iowa’s statute that restricts sex offenders from residing in a particular area was “far removed from the traditional concept of banishment” because it restricted only residence location and allowed offenders to freely “engage in most community activities.” 701 N.W.2d at 667-68.
This Court has applied the no-exile clause of Art. I, § 30, Ala. Const.1901, to prohibit the imposition of a sentence that requires the defendant to completely leave a jurisdiction and not return. See Warren v. State, 706 So.2d 1316 (Ala.Crim.App.1997) (holding that a guilty-plea agreement conditioned on the defendant’s agreement to leave the state upon release from prison and not return was invalid); see also Brown v. State, 660 So.2d 235 (Ala.Crim.App.1995) (holding that a guilty-plea agreement that called for the defendant to leave the county and never return without prior consent of the sheriff was beyond the jurisdiction of the court and void).
In the present case, we find that § 15-20A-10, Ala.Code 1975, Act No. 2007-450, and Act No. 2010-515 do not operate to banish individuals who are subject to those statutes’ residency requirements. Those particular statutes operate only to restrict where a sex offender can reside. Those statutes do not prevent a sex offender from engaging in most community activities, nor do they compel a sex offender to “quit” or leave a particular city or county or the state for any amount of time. Therefore, those statutes do not violate Art. I, § 30, Ala. Const.1901.
Based on the foregoing, the judgment of the trial court is affirmed.
AFFIRMED.
WINDOM, P.J., and WELCH, KELLUM, and JOINER, JJ., concur.

. The Eighth Amendment to the United States Constitution provides that "[e’jxcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.”

. Section 15-20A-2, Ala. Code 1975, provides, in pertinent part:
"The Legislature makes all of the following findings:
“(1) Registration and notification laws are a vital concern as the number of sex offenders continues to rise. The increasing numbers coupled with the danger of recidivism place society at risk. Registration and notification laws strive to reduce these dangers by increasing public safety and mandating the release of certain information to the public. This release of information creates better awareness and informs the public of the presence of sex offenders in the community, thereby enabling the public to take action to protect themselves. Registration and notification laws aid in public awareness and not only protect the community but serve to deter sex offenders from future crimes through frequent in-person registration. Frequent in-person registration maintains constant contact between sex offenders and law enforcement, providing law enforcement with priceless tools to aid them in their investigations including obtaining information for identifying, monitoring, and tracking sex offenders.
[[Image here]]
"(3) Homeless sex offenders are a group of sex offenders who need to be monitored more frequently for the protection of the public. Homeless sex offenders present a growing concern for law enforcement due to their mobility. As the number of homeless sex offenders increases, locating, tracking, and monitoring these offenders becomes more difficult.
[[Image here]]
“(5) Sex offenders, due to the nature of their offenses, have a reduced expectation of privacy. In balancing the sex offender’s rights, and the interest of public safety, the Legislature finds that releasing certain information to the public furthers the primary governmental interest of protecting vulnerable populations, particularly children. Employment and residence restrictions, together with monitoring and tracking, also further that interest. The Legislature declares that its intent in imposing certain registration, notification, monitoring, and tracking requirements on sex offenders is not to punish sex offenders but to protect the public and, most importantly, promote child safety.”